United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

SONYA MARIE DANIELS,

12
                    Petitioner,

13                                    No C-03-5293  VRW

        v

14                                        ORDER

GLORIA HENRY,

15
                    Respondent.

16 _____/

17

18

19        Petitioner Sonya Marie Daniels has filed a timely

20 petition for writ of habeas corpus under 28 USC section 2254.

21 Respondent Gloria Henry opposes issuance of the writ.  Petitioner

22 has exhausted available state remedies.  It is therefore proper for

23 this court to exercise habeas jurisdiction over this matter.

24 Having carefully considered the parties' contentions and reviewed

25 the trial record and the dispositions of the state appellate

26 courts, the court DENIES the petition.

27 \\

28 \\

United States District Court

For the Northern District of California

I

A

In 1998, petitioner Sonya Daniels and her husband Brian Daniels were tried together before a superior court jury in Santa Clara County on charges of homicide and felony child endangerment. The charges stemmed from the death of the couple's oldest child, Jory, and their alleged neglect of their second child, Anthony. After a forty-six-day jury trial, the trial court instructed the jury on charges of first degree murder by torture, second degree murder and involuntary manslaughter. After several days of deliberations, the jury convicted both petitioner and her husband of second degree murder and of felony child endangerment with a great bodily injury enhancement in connection with Jory's death and of misdemeanor child endangerment in connection with Anthony. The trial judge sentenced petitioner to fifteen years to life for the second degree murder conviction and a concurrent sentence of seven years for the felony child endangerment charge as to Jory. She received a concurrent term for the misdemeanor child endangerment charge as to Anthony. Clerk's Transcript (CT), Resp Ex A (Doc # 9), 2346-47.

Petitioner appealed her conviction. The court of appeal affirmed and the California Supreme Court denied review. She next filed a petition for writ of habeas corpus in the California Supreme Court, which denied the petition by means of a minute entry on November 25, 2003. Resp Ex D (Doc # 9).

Petitioner then brought a timely petition for writ of habeas corpus in this court. In her amended petition (Doc # 3), she asserts that she is entitled to habeas relief on the following

2

United States District Court

For the Northern District of California

six grounds:  (1) the trial court erroneously excluded evidence that her husband had battered her and evidence of the alleged battering's effects on her mental state, including expert testimony regarding Battered Women's Syndrome (BWS), petitioner's own testimony, and evidence that her husband had been incarcerated for several days in the period immediately prior to Jory's death for battering petitioner; (2) the prosecutor committed misconduct while cross-examining petitioner by pressing her for an explanation of her conduct, knowing that she was barred by the trial court's order from testifying about Brian's battering; (3) the trial court prejudiced petitioner by "repeatedly denigrat[ing] [her] counsel's competence and integrity in front of the jury"; (4) the trial court improperly admitted letters petitioner wrote to her husband from jail after the two were incarcerated following Jory's death; (5) petitioner's appellate counsel was ineffective; and (6) the trial court improperly denied petitioner's motion for a separate trial from Brian.  Am Pet (Doc # 3) at 12-26.

                              II

        28 USC § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  Accordingly, pertinent factual findings as set forth in the court of appeal's opinion (Am Pet Ex E at 2-24; 2001 WL 1191114 (Cal App 6 Dist)) are repeated below.

        Sonya met Brian when she was 16 years old and became
        pregnant with Jory at the age of 17.  She dropped out
        of high school, moved in with Brian's family and

3

United States District Court

For the Northern District of California

married Brian.  [FN1: Sonya's father described her as "very intelligent."]  Jory was born on August 23, 1988.  Jory weighed 5 pounds and 7 ounces at birth and was 18 inches long.  His size equated to about the 25th percentile of newborns.  He was a healthy baby, and he had normal weight and height gains in his first month of life.  When Jory was one month old, Sonya and Brian moved out of Brian's family's home and went to live with Sonya's aunt.  Sonya took responsibility for feeding Jory, bathing him and changing his diapers.  Jory stopped gaining an appropriate amount of weight after Sonya and Brian left Brian's family's home.  A physician noted the weight loss and advised Sonya and Brian to feed Jory formula whenever he was hungry because Jory was not receiving enough calories.  After living with the aunt for less than a month, Sonya and Brian moved on their own into an apartment.

On January 7, 1989 Sonya and Brian brought four-and-a-half-month old Jory to the Washington Hospital emergency room in Fremont.  Jory had a very serious skull fracture, a healing spiral tibial fracture, swelling, bruising, an inguinal hernia and an abrasion.  Jory was very underweight for his age at just 10 pounds and 13 ounces.  He had dropped to the 10th percentile in size for his age.  Jory's skull was swollen, bruised and fractured on both sides of his head, and his ear was also bruised.  There were two bruises to the bone of his left arm.  Jory had a scrape on his knee and an abrasion on his back that could only have been inflicted.  The spiral tibial fracture was at least a week old and would have been painful.  The skull fracture, on the other hand, was less than a week old.  The bruises on Jory's head were one to three days old.  The swelling could have been fresh or up to four days old.  Spiral fractures are usually caused by a twisting motion.  An extreme amount of force would be necessary to inflict the spiral tibial fracture and the skull fracture on an infant since infants have such bendable bones.  Neither fracture could have been sustained by an infant accidentally.

Sonya told the doctor that she had noticed bruising on Jory's face a month earlier.  She was not concerned about the bruises because she believed that babies bruised easily.  Sonya told the doctor she had noticed the hernia a month earlier.  Neither Sonya nor Brian could provide any explanation for Jory's injuries.  Jory was hospitalized for four days as a result of his injuries.  While in the hospital, Jory "acted hungry" and had a good appetite.  There were no indications that Jory suffered from any metabolic disorder.  The doctors who treated him concluded that he was a victim of child abuse and battered child syndrome.  After his

4

hospitalization, Jory was declared a dependent of the court, removed from the custody of Sonya and Brian and placed in foster care.  Sonya and Brian went back to live with Brian's family for a few months.

Jory thrived in foster care.  The first foster mother found Jory to be "very hungry."  Jory loved to eat and was "quite a good eater."  He gained weight rapidly and was up to 15 pounds and 11 ounces by March 7.  This growth brought Jory back up to the 25th percentile for his age.  Initially, he did not move around much and clearly had difficulty moving his broken leg and his injured left arm.  Jory also suffered from significant developmental delays.  Jory quickly overcame some of his developmental delays in the initial foster home.  Sonya and Brian visited Jory only once during the two months that he was in the initial foster home.

Jory was moved to a second foster home in March 1989 where he remained until he was 31 months old.  In April 1989, Sonya and Brian went to live with Sonya's family.  Initially, Jory was a very quiet child in the second foster home.  However, he made excellent progress in this foster home and eventually became active and grew "big" and "a little chunky."  By August 11, 1989, Jory weighed nearly 21 pounds, and by November 3, 1989, he was up to 22 pounds.  He also grew considerably in height and was "a healthy boy" with no medical problems.  Jory did not experience any stomach or digestive problems or any other chronic health problems while he was in foster care.

Sonya and Brian had a second son named Anthony in 1989.  Sonya and Brian initially had supervised visits and subsequently unsupervised visits with Jory while he lived in the second foster home.  During the supervised visits, Brian would usually assume responsibility for feeding, diapering and clothing Jory.  It appeared to the foster mother that Sonya "wore the pants in the family."  Sometimes Sonya and Brian brought Anthony along on their visits.  Anthony looked thin and dirty.  Eventually, Brian and Sonya were allowed to take Jory away for weekend visits.

Brian and Sonya were living with Sonya's parents at this time.  Sonya's parents lived in a house in a "nice upper-middle class neighborhood" in Fremont.  When Jory returned from these visits, he was usually "very quiet" and ravenously hungry.  Once, Jory was returned with obvious bumps on his face which required medical attention.  Sonya disclaimed any awareness of these bumps.  Several times Jory was returned with dirty diapers which had clearly been dirty for a long time.  On one occasion, the dirty diaper had caused

5

United States District Court

For the Northern District of California

Jory to have a very bad diaper rash which required medical attention.  After that incident, overnight visits were suspended for a time.

The social worker thought that Brian and Sonya were "extremely immature."  Brian was "particularly young and naïve" and seemed less sophisticated than Sonya.  Sonya told the foster mother that they went out to eat a lot and that she really enjoyed eating.  Sonya and Brian both appeared to be well fed.  Both Sonya and Brian adamantly blamed "the aunt" for neglecting Jory.

By 1991, Jory was a healthy, chubby child.  In May 1991, Sonya's parents became Jory's guardians, and Jory came to live with Sonya, Brian, Anthony and Sonya's family in Sonya's parents' home.  When Sonya's parents became Jory's guardians, the dependency case was apparently dismissed.  Neither Jory nor Anthony had any significant illnesses during their residence with Sonya's parents, and they both had good appetites.  Sonya's parents paid for all living expenses, but Sonya and Brian bought some food.  Sonya's parents were trying to help Sonya and Brian save money.  Sonya was responsible for cooking for the children.  Sonya and Brian often took the children away from the home on the weekends.  Sonya got upset when she learned that her mother was "sneaking" food to her children.

Sonya and Brian had a third son, Nicholas, in 1992. [FN2:  Sonya testified that she and Brian did not use any birth control.] Sonya showed "a lot of favoritism" for Nicholas.  Beginning in early 1992, some friends of Brian and Sonya began spending a lot of time with Brian, Sonya and the children.  These friends observed that Jory seemed hungry and looked malnourished.  Jory was extremely thin and had very thin arms and legs. Anthony did not seem as thin.  These friends noticed that Jory continued to look this way at least until February 1993 when the friends last saw Jory.  Jory never seemed to gain weight or grow significantly taller during this period of more than a year when Jory was three and four years old.  The friends never saw Jory sick.

Brian and Sonya would sometimes punish Jory by withholding food from him.  Jory was generally quiet and withdrawn when Sonya and Brian were present, and he was always quiet and very obedient.  However, he "would move for some food."  Jory spoke little, and when he did he usually sought food.  On one occasion, the friends fed Jory because he seemed to be very hungry.  When Brian learned of this, Jory was punished.  When Jory was spanked, he seemed very fragile and tiny "like there was nothing there."  Jory

6

frequently asked for something to drink when he was at the friends' home.  Sonya would not permit Anthony or Jory to drink any liquids between meals even when they complained of thirst and asked for drinks.  Both Jory and Anthony frequently drank out of the toilet and would be punished by Sonya and Brian for this behavior.  After drinking out of the toilet, Jory said he was thirsty.  Sonya and Brian told their friends that they limited the children's fluid intake to avoid the children urinating on themselves.  Jory frequently wet his pants and was not properly toilet-trained during this period.  The room in which the boys lived at Sonya's parents' home smelled strongly of urine.

Sonya, Brian and the children remained at Sonya's parents' home until the end of August 1993 or the beginning of September 1993.  In September 1993, Sonya, Brian and the children left Sonya's parents' home and moved in with Brian's mother and his two brothers to live in their two-bedroom apartment.  Sonya's parents never saw Jory again.  Brian's mother paid for most living expenses except for food.

Sonya was responsible for feeding the children when they lived with Brian's family.  Sonya was very particular about what the children ate.  "[I]f [other people] gave them food, [they] had to ask Sonya to give it to them.  See if it's okay with her as far as what they had.  She had a diet she wanted them to be on.  As far as feeding them something without her approval, you didn't do it."  Even when the children complained of hunger to others, Sonya would not allow anyone to feed them.  Brian's mother saw Sonya feeding the children.  Often she fed them "frozen pot pies." If the children did not finish the pot pies, Sonya would reheat the pot pie at the next meal and at the next meal after that until the children finished them.  She would not provide the children with other food.  When the children did not like the food she had prepared, Sonya would become angry and tell them they would "have to wait until the next meal."  There were times when Jory "snuck food."  Sonya would then reprimand him.  When the family ate out at a restaurant, Jory and Anthony would eat a large amount of food.  Sonya and Brian often ate fast food, but they would not give any to the children.  Jory and Anthony always seemed to be hungry and thirsty.  Jory was again seen drinking out of the toilet.  On one occasion, Jory told Sonya he was thirsty, but she gave him nothing to drink.  He then went and drank out of the toilet.  Sonya called Jory "a pig" when he ate too fast or too much.  She also would take away food if Anthony or Jory "ate too fast."

7

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jory was a very quiet child during this period.  He "didn't really move around much," and was fairly inactive and "still."  Jory was a well-behaved child who tried to avoid getting in trouble.  Both Jory and Anthony were quiet children who appeared to be "nervous and afraid" that they might do something wrong and get in trouble.  By the time they came to live with Brian's family, both Jory and Anthony no longer wore diapers. However, both of them frequently wet their bed and their clothing, and Sonya and Brian did not change their clothing or bedding sometimes for as long as a day.

Brian's family thought Jory looked "skinny" but normal.  Brian's mother observed that both Jory and Anthony were thin and were "good eater[s]."  Brian's brother expressed the belief that Sonya "broke Jory's personality and partially broke Anthony's personality."  Brian's brother suggested to Sonya and Brian that they take the kids to the doctor, but they declined.  Neither Anthony nor Jory appeared to suffer any illnesses during this period.  Sonya regularly visited the doctor for her own ills.  Sonya and Brian generally would not allow Brian's mother or father to babysit the children, but they did let Brian's mother watch the children once for a two-hour period.  Sonya and Brian always took the children with them when they left the apartment.  Brian's mother never bathed Anthony or Jory or even saw either of them undressed. When Brian's father saw Jory, Jory was always fully dressed in heavy oversized clothes.  Although Brian worked during this period of time, he seemed to have a lot of time off.  Sonya and Brian did not lack financial resources.  They had saved around $10,000 with which they hoped to put a down payment on a home.

In early February 1994, Sonya, Brian and the children left Brian's family's apartment and moved to a motel room.  This move was necessary because Brian's family had been threatened with eviction due to the overcrowding of their apartment.  Brian's mother saw the children only once more before Jory's death.  On that occasion, Jory looked sick.  On the only occasions on which Jory was seen after that, Jory was bundled up in a fully zipped jacket and hood so that one could see nothing of his body but his face and hands.  Jory always seemed to be cold.  On March 16, 1994, Sonya was prescribed medication by a Kaiser doctor for scabies for the entire family.  Brian, Sonya and the children remained at the motel until March 20, 1994.

On March 20, 1994, Sonya, Brian and the children moved to an apartment in Milpitas.  The Milpitas apartment had two bedrooms and two bathrooms.  While they lived

8

United States District Court
For the Northern District of California

1 | 2 | 3 | 4 | 5 | 6 | 7 | 8

at this apartment, a neighbor observed that the children were dirty and unkempt and that "the kids seemed to be locked up" in the apartment.  A police officer visited the Milpitas apartment on March 31, 1994.  The apartment was a mess with dirty dishes all over the kitchen and boxes, clothes and papers all over the floor.  Nicholas was lying on the floor watching television.  The officer heard noise coming from one of the bedrooms, and Sonya said that her two other children were sleeping in there.  When the officer started to open the bedroom door, Sonya stopped her.  The next day, the officer returned and knocked on the apartment door.  Sonya opened the door only a crack and spoke to the officer through the crack.

A police officer arrived at the Milpitas apartment just after 4:00 pm on April 6, 1994 in response to a 911 call.  Sonya opened the door and motioned the officer inside.  She said nothing.  Brian was sitting on the couch rocking Jory in his arms and crying hysterically.  The police officer asked Sonya when she had last seen Jory breathing.  Sonya said she did not know, but she had heard Jory making noises right before she called 911.  Jory was wrapped in a blanket and looked dead.  He was not breathing and had no pulse.  His body felt cold, and his arm was "very rigid."  Jory was so thin that his bones were visible through his skin.  His body was the size of a two-year-old's body.  There were bruises along the bridge of his nose and around his eyes.  He had a rash all over his body and "small pock marks" around his waist and stomach area, but his body appeared to be clean.

The police officer began CPR.  After the first breath the officer gave Jory, an off-white liquid came out of Jory's mouth and nose.  Fire department personnel arrived about two or three minutes later.  They took over the provision of CPR.  The attempts of fire personnel to put an airway into Jory were unsuccessful because his neck was stiff with rigor mortis.  Two or three minutes after the fire personnel arrived, paramedics arrived, determined that Jory was dead and discontinued CPR.  The paramedics noted that Jory's jaw was so stiff that his mouth could not be opened enough to allow ventilation.  Jory also had stiffness in his extremities and his body was cold to the touch.  Fully developed rigor mortis takes more than an hour to reach this stage.  When a paramedic informed Sonya that Jory was dead, Sonya made no physical, audible or emotional response.

The Milpitas apartment was very "cluttered," "very unkept" and had a strong stench of urine and stale

9

United States District Court

For the Northern District of California

food.  Both bathrooms were "very messy," dirty and
smelly.  In one bathroom, there was urine on the
floor.  No towels or toilet paper were found in this
bathroom.  The master bedroom had no beds or other
furniture.  Instead the floor of the room was covered
in piles of clothes about 5 to 6 inches deep.  The
room smelled dirty.  The children's bedroom had a "kid
guard" to keep the children from entering the hallway.
There was one small child-sized bed in this room with
no sheets or blankets on or near it.  No other beds
were found in the apartment.  There were no bottles or
liquids found in the children's bedroom, nor was there
any food in the room.

A partially used bottle of "Pedialyte," an empty
bottle of fruit-flavored "Infalyte," a container of
"Flintstones" vitamins and a medicine bottle
containing scabies medication were found on the
kitchen counter.  The vitamin bottle was a little over
a quarter full.  The scabies medication bottle was
two-thirds full.  A box of cream of wheat was
somewhere in the kitchen.  The kitchen cabinets
contained mustard, ketchup, some crackers, a couple of
boxes of cream of wheat cereal, a bag of rice, pasta,
cans of tomato paste and a can of fruit.  This food
was located on high shelves out of reach of a child.
There were dirty dishes in the sink and clean dishes
in the dishwasher.  The freezer contained frozen meat,
frozen chicken, frozen tortillas and frozen buns.  The
refrigerator contained only bottles of "Arizona Iced
Tea," mayonnaise, pickles, margarine, some bread and a
container of water.  No milk or juice was found in the
apartment.

Both Sonya and Brian gave statements to the police
after Jory's death.  Sonya told the police that Jory
had last eaten the previous evening at 7:00 pm when
she had fed him one or two spoonfuls of cream of
wheat.  Jory had awakened on the morning of his death
at 6:00 am.  She gave him a couple of sips of
Pedialyte, and he lay back down.  Between 9:00 and
10:00 am, Sonya called Kaiser in Fremont about Jory,
and the advice nurse told her that it sounded like
Jory had a virus.  According to Sonya, the advice
nurse told her to give Jory some Pedialyte.  She
claimed that the advice nurse told her "that there was
[sic] not very many appointments available and it did
not appear to be an emergency situation."  She took
the children to her parents' home to do some laundry.
Sonya said she was only there for ten minutes, and
Jory remained in the car sleeping.  At noon, she left
there and returned to the Milpitas apartment.  Sonya
then put Jory to bed.  Sonya told the police that she
had tried to get Jory to drink as much Pedialyte as
possible so as to build up his strength to eat food.

United States District Court

For the Northern District of California

At 1:00 pm, she tried to give Jory some Pedialyte, but he would not drink it.  At 3:00 pm, she took Jory out of his bed and put him on the couch.  At that point, Brian noticed foam coming out of Jory's mouth and told Sonya to call 911.  Just before she called 911, she heard Jory making noise.  Sonya did not tell the police at that time that she had been to Kaiser Fremont that day.  She told the police that Jory had last been seen by a doctor a year earlier for a skin problem.  Sonya insisted that she had been feeding the children three meals and two snacks each day.

Brian told the police that he had gotten up at 7:00 am that day.  Anthony and Nicholas were awake, but Jory and Sonya were still sleeping.  Brian played video games for a while.  They all then drove to the home of Sonya's parents to do their laundry.  Next, at about 10:30 am, they went to Kaiser.  Sonya went inside to have a pregnancy test while Brian and the children waited in the car.  They went back to Sonya's parents' home, and Brian changed the oil in the car while the children remained in the car.  Anthony and Nicholas were playing in the car while Jory was sitting quietly.  They were at the house for about an hour.  Then they drove to Grand Auto to drop off the used oil and buy an oil treatment for the car.  This errand was followed by a trip to Lucky's to buy Pedialyte for Jory.  From Lucky's, they drove back to their Milpitas apartment.  Jory appeared to be weak or asleep and was unresponsive, so Sonya carried Jory into the apartment.  Sonya gave Jory half a bottle of Pedialyte and some cream of wheat.

Brian said that he returned to Sonya's parents' home to finish the laundry.  He forgot the keys so he had to return to the Milpitas apartment to retrieve them.  When he got to the apartment, Jory was lying on the floor wrapped up in a blanket.  Brian went back to get the laundry and then returned to the apartment.  When he was bringing the laundry in, Sonya came to the doorway with a worried look on her face.  Sonya told him to move the car.  After he returned from moving the car, Sonya said "Jory."  Brian went over to where Jory was lying on the floor and immediately told Sonya to call 911.  Jory had white foam coming from his mouth and he was cold.  Brian disclaimed any knowledge that Jory was sick or had been complaining of anything. Brian told the police that he had not observed any symptoms that Jory was ill.  Brian also told the police that he had not been home from the evening of March 31 to the evening of April 4.  Finally, Brian told the police that Sonya usually "fed the children separately because Jory would eat all the food."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

While the police were at the apartment on April 6, Anthony repeatedly asked for "Pedialyte" at a rate of several requests in a span of five minutes. Anthony also said that he was "thirsty." Anthony continued to request Pedialyte until he was given something to drink by one of the police officers. He rapidly consumed a whole glass of liquid when he was given one. Anthony's younger brother Nicholas was wearing a dirty diaper and soiled clothes which smelled strongly of urine. Later, both boys made further expressions of thirst and hunger. They voraciously consumed food and drinks as soon as they were provided and sought more. Although Anthony was not wearing a diaper, he did not appear to be toilet-trained.

While Anthony was twice as old as Nicholas, the two boys appeared to be about the same size with Nicholas seeming a bit larger than Anthony. Four-year old Anthony was undernourished and "markedly small for his age." Anthony was determined to be suffering from malnutrition and protein deficiency and had scabies all over his body. Two-year-old Nicholas was not malnourished but was dirty and had scabies. Anthony's malnutrition appeared to be of a duration of at least a few months, but it could have been caused by a complete lack of food for as little as two weeks. His abdomen was distended, and his legs had suffered muscle wasting. Anthony exhibited an unusual thirst for water. He could not stand or walk on his own and had significant developmental delays. Anthony had an enlarged fatty liver which was a product of "chronic malnutrition." He was tested for parasites and bacteria, and all tests were normal. Anthony was 34.5 inches tall and weighed 26 pounds. Because Anthony's height and weight were both very low for his age, it was determined that his malnourishment had been "severe and chronic" and "very long term." Anthony was suffering from the worst case of malnutrition in an otherwise normal child that the physician who treated him had seen outside of Africa.

Anthony's x-rays showed multiple growth arrest lines. Growth arrest lines are caused when a child's growth stops and then starts again. These lines can be caused by malnutrition or a serious illness which lasts more than several days. If growth does not resume, the termination of growth does not cause a growth arrest line. Only "very extreme" malnutrition would cause a growth arrest line. There was no evidence that Anthony had suffered from any serious illness which could have caused these lines. The physician attributed these lines to "different periods of malnutrition in his life."

12

United States District Court

For the Northern District of California

Anthony was placed in foster care.  He ate voraciously and constantly sought water and food.  Anthony quickly began gaining weight and gained four pounds in two months.  His height also increased rapidly.  His liver returned to normal size.  Once he had gained weight and height, his hunger and thirst diminished to a normal level and his growth leveled out.  The physician concluded from this that Anthony's condition was solely attributable to severe chronic starvation.  She believed that Anthony had been a victim of child abuse, and that it was dangerous to his life for him not to have received medical attention prior to April 7, 1994.

An autopsy was performed on Jory at 9:30 a.m. on April 7.  His body was 35.5 inches tall and weighed 19 pounds.  This height and weight indicated that Jory had not gained even an inch in height since 1991 and had lost 12 pounds since then.  Jory was five years and eight months old at the time of his death, but his body was the size of a two-and-a-half-year-old to three-year-old child. [FN3: His first foster mother saw his body and thought that he looked about the same size at death as he had when he left her care at the age of six and a half months.] Jory had multiple growth arrest lines.

Jory's body was extremely thin.  His body had experienced such an extensive loss of subcutaneous tissue and wasting of muscle that there was no subcutaneous fat under his skin and no muscle on his limbs.  Jory's pelvic bones, shoulder blades and ribs were very prominent and were protruding out from under his skin through which they could be seen.  He had no cheeks, his eyes were sunken and his face had no fat.  No fat or muscle was present in his buttocks.  Jory's heart, lungs, liver and kidneys were significantly undersized with some of them being just half the size that would be expected for a five to six-year-old child.  However, none of these organs appeared to have malfunctioned.  His lungs were not infected.  His heart and other tissues showed signs of atrophy.  His liver was atrophied but was not fatty.  Jory had lost about 70 percent of his glycogen stores in his liver.  Only a prolonged lack of food would cause such a reduction in stored glycogen.

The condition of Jory's body was consistent with a type of starvation called Marasmus.  There are two kinds of starvation.  One kind is called Marasmus and is caused by "a low intake of all dietary components."  A human can die of marasmic starvation even though the body is consuming some food if there is an insufficient supply of calories.  [FN4:  It is recommended that a five year old child consume a

13

United States District Court

For the Northern District of California

minimum of about 1200 calories per day, and most children eat more.]  Marasmus causes the body to become weak and emaciated and results in the wasting or loss of subcutaneous tissue and muscle.  The liver will generally appear normal other than being smaller in size.  The body's organs will be of reduced size.  A human suffering from marasmus will become lethargic, the body temperature will fall and eventually the heart will fail.  The other kind of starvation is called Kwashiorkor and results when there is an adequate intake of calories but inadequate intake of protein. The distinguishing symptoms of Kwashiorkor are generalized edema or swelling of the body's tissues, distension of the stomach and accumulation of fat in the liver.  [FN5:  A marasmic body may have a distended stomach.]

In addition to his wasted condition, Jory had a bruise in the shape of a loop on his leg.  This bruise was at least four days old.  Due to the shape of the bruise, it did not appear that it could have been caused by accident.  He also had bruises between his eyes and on the bridge of his nose and seven separate bruises on his scalp.  These bruises could have come from a blow or a fall.  The facial and scalp bruises were no more than two days old.  The scalp bruises could have been caused by a single impact or multiple impacts.  These bruises were not consistent with having been accidentally suffered.  His stomach was not distended, and it contained a small amount (150 grams) of partially digested rice cereal.  This cereal had been in his stomach for at least two hours prior to his death.

The coroner determined that Jory had died from "cachexia and inanition due to longstanding nutritional deprivation."  Cachexia and inanition both mean wasting.  By longstanding, the coroner meant "many weeks or months."  The coroner found nothing in the autopsy which was inconsistent with death by starvation.  Every finding was consistent with death by starvation.  There was no evidence of any congenital abnormality or organic disease.  Jory had not suffered from meningitis.  A microscopic examination of Jory's stomach found no abnormalities.  There was no sign that Jory had suffered from any chronic malabsorption syndrome, but the coroner did not microscopically examine the intestinal tract so "acute" and "chronic" malabsorption could not be ruled out solely on the basis of the autopsy.  However, the other evidence ruled out any chronic malabsorption syndrome.  Most malabsorption syndromes would produce a Kwashiorkor condition, rather than a Maramus condition, because protein would be the primary item that could not be absorbed while other constituents of

United States District Court
For the Northern District of California

food would be absorbed.  Further, since Jory had grown
rapidly in foster care and then failed to grow for
several years in his parents' custody but had suffered
no other symptoms of any malabsorption syndrome, a
chronic syndrome could not have been responsible.
There was no evidence that Jory had a malabsorption
syndrome called Celiac disease which involves a
sensitivity to wheat products.  He had never exhibited
symptoms of a sensitivity to wheat, and Celiac disease
is rare in black children.

After Jory's death, Sonya told her father that Jory
had died of meningitis.  Anthony, Nicholas and Sonya's
and Brian's fourth son (born after their arrest) were
adopted by Brian's mother.  None of the children have
had any further health problems.  Neither Sonya nor
Brian were "underweight" at the time of Jory's death.

Sonya and Brian were charged by information with
murder (Pen Code, § 187), torture (Pen Code, § 206)
and two counts of child endangerment (Pen Code, §
273a, subd (a)(1)).  The named victim for each count
was Jory except for the second child endangerment
count which was alleged to have been committed against
Anthony.  The information specially alleged that each
of them had personally inflicted great bodily injury
(Pen Code, §§ 667, 1192.7, 12022.7, subd (a)) in the
commission of each of the child endangerment counts.
It was further alleged that Brian had suffered a prior
serious felony conviction (Pen Code, § 667, subds (a),
(b)-(i)).  Brian's motion to suppress evidence of his
statements to the police was denied.  The court ruled
that in limine rulings were binding at trial and that
counsel did not have to renew their objections.

The prosecution presented a large quantity of expert
medical testimony at trial.  These experts described
the process of severe malnutrition.  A malnourished
child will first stop gaining weight.  His height will
continue to increase until the malnourishment has been
ongoing for "quite a bit of time."  Then the child's
growth in height will slow down.  When the child's
body's fat stores are depleted, the child will begin
to lose weight.  Food and water seeking behavior such
as drinking toilet water may occur.  The child will
become weak, cold and inactive.  These experts
concluded that Jory was a victim of Marasmus.  The
prosecution's expert witnesses were convinced that
Jory had not been suffering from any metabolic
disorder due to his history of growth in foster care,
the absence of any evidence of a metabolic disorder at
that time and the absence of any report of symptoms of
any metabolic disorder thereafter.  The prosecution's
experts opined that the length of time that Jory had
lived with no growth and the presence of multiple

15

growth arrest lines indicated that he "had intermittent bursts of perhaps better nutrition combined with poor nutrition."  In their opinion, Jory would have required hospitalization "weeks" before his death and only possibly could have survived if he had been hospitalized a week prior to his death.

The prosecution presented evidence that Sonya had not called Kaiser on the day of Jory's death.  Every phone call to Kaiser's advice center is logged by an advice nurse by patient name.  The logs for April 6, 1994 contained no record of a call regarding Jory Daniels.  If someone had called Kaiser seeking an appointment, an appointment would have been provided.  Appointments were available on April 6, 1994.  No appointment had been made for Jory.  An advice nurse would not have recommended Pedialyte for a five-year-old.  The prosecution presented evidence that neither Jory nor Anthony had ever been treated by any Kaiser facility.

Brian presented testimony by defense medical experts that they could not be certain how Jory reached the physical state which caused his death although they agreed that he suffered from severe malnutrition at the time of his death.  Their primary concern was the absence of any microscopic examination of Jory's intestines during the autopsy.  The defense experts conceded that withholding of food could have been the cause of Jory's death and that the evidence was consistent with starvation by that means, but they felt that they could not be certain.

One expert, who agreed that Jory had been malnourished, felt that the coroner's failure to microscopically examine Jory's intestines during the autopsy left open the possibility of a malabsorption problem.  [FN6: This expert also disputed the coroner's testimony that the loss of glycogen stores in Jory's body was consistent with long-term malnutrition.  This expert testified that glycogen stores could be reduced to zero after 12 hours of fasting.  This expert was also concerned that the presence of a small amount of food in Jory's stomach seemed inconsistent with food being withheld.]  He thought that Jory could have suffered from Celiac disease.  This expert disputed the prosecution's contention that Celiac disease was rare in blacks and simply asserted that the prevalence of the disease in blacks was unknown.  Although he conceded that Celiac disease is something one is born with, he opined that it "can become symptomatic" later in life.  He stated that Celiac disease would have had to have affected Jory for "more than a year" for him to reach the state he was in at death.  This expert also believed that Jory could have suffered from a "chronic parasitic

16

United States District Court

For the Northern District of California

infection" such as giardia or cryptosporidium or an "inflammatory" disease such as Crohn's disease or ulcerative colitis.

This defense expert felt that a parasitic infection or inflammatory disease could have caused Jory to go into a "downward spiral" that produced death in "several weeks." This expert conceded that there was no evidence that Jory suffered from any of these infections or diseases. Furthermore, he conceded that Jory must have been malnourished, no matter the cause, for more than a year prior to his death since his height was stunted and he had lost so much weight. He also admitted that Jory's condition at death was inconsistent with death by a viral or bacterial infection. This expert expressed the opinion that, if Jory had actually suffered from untreated celiac disease or any of these other diseases, failing to seek medical attention would have been dangerous to Jory's life.

Another of Brian's expert witnesses was primarily concerned about the adequacy of the autopsy, but she conceded that "clearly, this child has been sick for some period of time, or has had some problem, and I think he should have seen a doctor." A third defense expert testified that Jory's heart tissue did not show specific indications of starvation.

After Brian had presented his defense, Sonya, who had originally rested without presenting any evidence, was allowed to reopen her case and present her own testimony and brief testimony from her father.

Sonya testified that she had never noticed Jory's 1989 broken leg or fractured skull. Sonya admitted that she had never taken Jory to the doctor again after the 1989 incident even when he was ill and had never taken Anthony to the doctor even though she had herself gone to the doctor on numerous occasions. She claimed that, the one time she wanted to take Jory to the doctor, Brian and his family members opposed the idea and she tried but failed to accomplish this task. Sonya maintained that Jory had been sick but twice between 1991 and his death.

Sonya asserted that Brian had not worked for several months after they moved in with Brian's family in September 1993. She claimed that they simply used their savings to pay for food. They had saved at least several thousand dollars which they were intending to use to purchase a condo. In 1992 and 1993, Sonya filed lawsuits against a bank, a department store, Kaiser and other businesses. [FN7: She defaulted on all of the lawsuits but one which she

United States District Court

For the Northern District of California

settled.] She did all of the work on these lawsuits personally. Sonya testified that Brian's family members frequently watched the children while Brian and Sonya were away from Brian's family's apartment. Sonya claimed that she and Nicholas, but not Jory, Anthony or Brian, moved to the motel room in February 1994. She asserted that Brian, Jory and Anthony remained at Brian's family's apartment. Nevertheless, she admitted that she saw Jory while she lived in the motel and, according to her, he did not look any thinner. Sonya testified that she became pregnant while she was living at the motel. Sonya conceded that she and the children moved to the Milpitas apartment on March 20, 1994. Sonya testified that "the very best part" of her marriage to Brian was the time they spent together after Jory's death without any children.

Sonya "blame[d] a lot of people" for Jory's death. Sonya claimed that she had always fed Jory on a regular basis, and she admitted that she had been solely responsible for feeding and bathing the children while they lived with her parents and that she had been responsible for feeding the children while they lived with Brian's family in 1993 and 1994. When they were living in the Milpitas apartment, Sonya claimed that she fed the children three meals a day and two snacks. Sonya contended that Brian was responsible for disciplining the children but that neither she nor Brian had withheld food from the children. She asserted that Jory ate regularly until the last three days of his life. It was only during those last three days when he became sick with what she thought was the flu that she had to feed him. On the other hand, at another point in her testimony, she asserted that Jory "didn't feel like eating" some of the time between March 31 and April 4.

Sonya admitted that she was aware that Jory was "thin," but she did not think that Anthony was "skinny." Sonya testified that she "didn't notice" that Anthony was very thin. She also did not notice that Jory lost weight at any point or that his bones were sticking out. Sonya testified that she had weighed Jory only once in the last three years of his life, in September 1993, and he weighed 35 pounds at that time. She disclaimed having seen either boy's body, and she reluctantly admitted that she might have seen the two boys dressing themselves sometimes, but she could not recall any occasions. She claimed that she never saw Jory without his clothes on after September 1993. Sonya testified that Jory always got up and dressed himself including on the morning of his death. She also asserted that he and Anthony bathed themselves or that Jory bathed Anthony. Sonya

18

United States District Court

For the Northern District of California

asserted that she did not know how Jory came to be in
the condition he was in at death, and she had not
noticed him looking so thin.  Sonya actually denied
that Jory had looked as the photographs showed him
looking at the time of his death.

Sonya's description of the last few days of Jory's
life gave no clue to the cause of his death.  Sonya
thought that Jory might have had diarrhea in the few
days before his death because she saw him going into
the bathroom repeatedly.  She made no effort to assist
him, nor did she ask him about it.  Sonya testified
that three days before Jory died she thought he had
the flu. She did not notice that he had lost weight,
and it was only on the day of his death that she
thought he "didn't look well."  Sonya asserted that
Jory had eaten "a lot of hash browns" the day before
his death.  On the day of his death, she fed Jory some
cream of wheat and some juice.  Although she said that
Jory looked sick, she claimed that he had gotten up
and dressed himself that morning, but she had needed
to feed him because he was sick.

Sonya's testimony about the events on the day of
Jory's death basically tracked the statements she and
Brian had given to the police.  They went to her
parents' home and did the laundry.  Since Jory "didn't
look well," she called Kaiser from her parents' home.
[FN8:  Although Sonya testified that Jory had only
been sick for three days prior to his death, she also
claimed that she had called Kaiser about him on April
2, four days prior to the day of his death.  She
subsequently claimed that she had meant "about three
days" and that Jory had gotten sick on April 2.]
Sonya claimed that she asked the advice nurse for
information about what to do for the flu that she
thought Jory was suffering from. She testified that
she was told that he did not need an appointment but
should simply be given Pedialyte or Gatorade and
Jello.  They went to Kaiser for her to get a pregnancy
test.  She and Brian discussed whether she should take
Jory in to be seen, and they decided that Jory would
not be taken in.

One portion of her testimony did not track their
statements.  Sonya asserted for the first time that
Brian drove very quickly away from Kaiser and Jory
"flipped over" onto his seat belt.  When Sonya tried
to help Jory sit up, she found him unresponsive.  At
this point, she finally "noticed something was wrong
with him" and that Jory did not just have the flu.
Jory was unconscious but was breathing and had a
pulse.  [FN9:  Prior to her trial testimony, Sonya had
not told the police or the juvenile court about this
incident in the car.]  Brian refused to stop the car

United States District Court

For the Northern District of California

and "kept smacking me" and trying to get her to resume her seat.

The rest of her description basically tracked the statements.  They went to Lucky's and thereafter to Grand Auto.  When they got back to the Milpitas apartment, Sonya carried Jory into the apartment and put him on the floor.  She claimed that she did not notice his bones sticking out when she carried him into the apartment.  Brian went back to get the laundry.  When Brian returned, he gave Jory a bath and then dressed Jory in clothes of Nicholas.  Jory remained unconscious, but Sonya heard him "making these noises."  Sonya admitted that she and Brian talked for "a long time" which "seemed like hours" about what to do as Jory lay on the floor in the living room.  Eventually, after she knew that Jory was dead, she called 911.

On rebuttal, the prosecution presented further testimony by their experts that Jory could not have had Celiac disease, ulcerative colitis or an inflammatory intestinal disease such as Crohn's disease because his history and the autopsy findings were inconsistent with these illnesses.  The prosecution also presented reiterative testimony that Celiac disease is "very rare" in African-American children.  An inflammatory disease could be ruled out because it would have caused persistent illness or persistent symptoms, and the evidence established that Jory had not been persistently ill or suffered chronic symptoms.

The prosecution proceeded solely on a theory of implied malice as to the murder count.  The prosecutor argued that Sonya and Brian "just didn't feed this poor kid enough" and then failed to take Jory to a doctor "when he needed it."  She asserted that it was not possible that Sonya and Brian could have failed to "notice" Jory's life-threatening condition.  Sonya's trial counsel argued that the evidence did not show any "intentional misconduct" by Sonya and that Jory might have died from an infection or a "malabsorption disease."  He asked the jury to find Sonya guilty of involuntary manslaughter for Jory's death.  Brian's trial counsel asserted that Brian had lacked any culpable mental state and therefore should not be found guilty of murder or involuntary manslaughter.  He contended that Brian had not been aware of Jory's condition because he had been working a lot, was not around when Jory was fed and reasonably inferred that Sonya was feeding him.  Brian's "inattention or mistake in judgment are not enough."  Brian's trial counsel conceded that Jory was malnourished, but he argued that this could have come about as a result of

United States District Court

For the Northern District of California

1

2

3

> a disease, infection, virus, bacteria or parasitic
> infection rather than starvation.  Brian's trial
> counsel asked the jury to simply convict Brian of
> felony child endangerment as to Jory.

4

5

6

> The great bodily injury enhancement accompanying the
> child endangerment count as to Anthony was dismissed
> by the prosecution before the case went to the jury.
> The jury was instructed on first degree murder by
> torture, second degree murder and involuntary
> manslaughter as to the homicide count.

7

8

9

10

11

12

13

> The jury deliberated for several days.  During its
> deliberations, it requested, among other things, that
> the testimony of Brian's friend (to whom he had
> admitted battering Jory in 1989) be reread.  The jury
> returned verdicts finding Sonya and Brian guilty of
> second degree murder and of the felony child
> endangerment count involving Jory.  The great bodily
> injury allegations accompanying this child
> endangerment count were found true.  The jury found
> Sonya and Brian guilty of the lesser included offense
> of misdemeanor child endangerment on the count
> involving Anthony.  The jury acquitted both Brian and
> Sonya of torture.  Brian waived his right to a jury
> trial on the prior conviction allegation.

14

15

16

17

> Motions seeking a new trial by both Sonya and Brian
> were denied.  The prosecution's motion to strike the
> prior conviction allegation as to Brian was granted.
> Sonya and Brian were each committed to state prison to
> serve a term of 15 years to life.  * * *  They each
> filed a timely notice of appeal.

18   Am Pet Mem Ex F at 2-24.

19

20                                    B

21           Petitioner's and Brian Daniels's appeals were consolidated

22   and considered together by the Sixth District court of appeal.

23           Petitioner retained private counsel, Brenda Malloy (State

24   Bar number 88626), to assist her on appeal.  Ms Malloy filed a

25   twenty-seven-page brief in which she raised eight issues including,

26   as relevant here, that:  (1) the trial court erred in excluding BWS

27   evidence; and (2) the trial court erred in denying petitioner's

28   \\

21

United States District Court

For the Northern District of California

motion for a separate trial.  No federal constitutional grounds were
set forth in support of the BWS evidence issue, Am Pet Mem Ex D(1)
at 8-20.  The section of her appellate brief discussing the trial
court's denial of her severance motion characterized the ruling as
"a federal constitutional violation."  Id at 28.  After oral
argument, at which Ms Malloy failed to appear, petitioner,
represented by her current counsel, moved to strike the brief and to
substitute new counsel.  The court of appeal granted the motion to
substitute new counsel but denied the motion to strike the brief.
Am Pet Mem Ex E(2).

The court of appeal issued a sixty-six-page unpublished
opinion affirming the convictions of both petitioner and Brian
Daniels.  Am Pet Mem Ex F.  The opinion specifically discussed
petitioner's challenges on appeal to the following rulings by the
trial court:  (1) the exclusion of BWS evidence (at 24-34); (2) the
denial of petitioner's motion for a separate trial (at 34-36); and
(3) the exclusion of evidence that Brian tried to persuade
petitioner to have an abortion (at 37-38).  It also considered
petitioner's challenges to the sufficiency of the evidence at trial
to support the verdict on two points:  (1) the "implicit finding of
implied malice" (at 39-41); and (2) the cause of Jory's death (at
41-42).  The court of appeal mentioned three other issues cursorily
raised in petitioner's brief (and omitted from her reply brief) that
it deemed not sufficiently well-articulated to warrant
consideration.  Id at 42-44.  None of these issues appears in
petitioner's federal habeas petition.

The court of appeal's opinion contains numerous references
to deficient, confusing and/or inadequate briefing submitted by

22

United States District Court

For the Northern District of California

Malloy.  For example, towards the beginning of its extensive discussion of petitioner's contention that "the trial court prejudicially erred in precluding her from presenting at trial an expert witness on [BWS]," the court commented as follows about the briefing submitted on that issue:

> Her opening brief contains 12 pages devoted to this contention.  The first three and a half pages of this discussion contain no citation to the record or to any authority.  The next five and a half pages of this discussion are an unattributed verbatim reproduction of a brief submitted by Sonya's trial counsel to the trial court.  These pages cite one book, three statutes and, in the very last paragraph, a single case authority.  The final three pages of this discussion contain extensive quotations from the prosecutor's argument to the jury and the trial court's ruling that BWS evidence was not admissible.  This discussion ends with the following sentence "Please see also RT 3005 through 3008; RT 3885 through 3890; RT 3530 at lines 8-12; and RT 1605 through 1621."  No explanation or argument accompanies these record citations.
>
> The Attorney General maintains that Sonya's briefing on this issue is so deficient that she has failed to preserve it for review.  While the briefing submitted by Sonya's retained appellate counsel on this issue does not comport with the standards of competent appellate counsel, we are loath to deprive Sonya of appellate review of this issue and provoke a habeas petition based on ineffective assistance of appellate counsel where her retained appellate counsel has actually presented some discernable arguments in support of her contention.  We therefore consider the merits of her appellate contention.

Am Pet Mem Ex F at 24-25.

The court of appeal then considered and rejected three theories of relevance petitioner offered in support of her argument for reversal based on the exclusion of BWS evidence:  (1) it was relevant to a "mental impairment" defense; (2) it offered "an alternative explanation for facts which might otherwise lead to an inference of intent to kill"; and (3) it could have rehabilitated

23

United States District Court

For the Northern District of California

petitioner's credibility as a witness.  The court held that Penal Code sections 28 and 29, which limit the admissibility of evidence of "mental disease, mental defect, or mental disorder" for the purpose of negating the relevant mental state for a crime, "clearly bar[red] admission," Am Pet F at 32, of BWS testimony for the purpose sought —— to show that BWS "deprived [petitioner] of the capacity to either form the intent to kill or to subjectively appreciate Jory's need for food or medical attention."  Id at 31-32. The court found no foundation in the trial evidence for petitioner's second theory —— that her acts and omissions or her contemporaneous mental state were "related to misconceptions about battered women" warranting clarification by means of BWS expert testimony.  Id at 33.  And the court found no basis for admitting BWS expert testimony for the purpose of rehabilitating petitioner's credibility, given that she never testified that she failed to feed or seek medical care for Jory because her husband was battering her; rather, she insisted that she had always fed Jory regularly, had not noticed his weight loss and had never thought he required medical attention. Id.  The court commented, moreover, that petitioner's testimony "as a whole was riddled with both internal inconsistencies and inconsistencies with other evidence and her own prior statements" that could not have been rectified through the admission of BWS expert testimony.  Id.

        On the issue of the trial court's denial of the motion for severance, the court of appeal observed that petitioner's primary argument for severance was the potential for conflicts over the admission of evidence that Brian Daniels battered her.  The court held that since the BWS evidence was properly excluded on relevance

**United States District Court**
For the Northern District of California

grounds anyway, the trial court did not abuse its discretion in refusing to sever the trials.  Id at 36.

With regard to the trial court's exclusion of evidence that Brian Daniels had allegedly tried to force petitioner to have an abortion, the court of appeal wrote that petitioner's briefing raised the issue "in summary fashion" without argument or citation to authority or to the record, and that the Attorney General was "at a loss to understand the basis for Sonya's claim." Id at 38.  The court, while "reject[ing] her claim as not properly raised" nonetheless disposed of it in a footnote, writing "[w]e can only surmise that she is relying on her trial counsel's assertion that Brian's alleged desire that she abort her pregnancy showed that he wanted to 'destroy a child' which would somehow establish a pattern of conduct which would incriminate Brian in Jory's death. * * * * We cannot even imagine any merit that this contention could have." Id at 38, n 16.

On the sufficiency-of-evidence issues (implied malice and cause of death), the court wrote that petitioner's brief contained no citations to the record and citations to case authorities that bore no relevance to the issue at hand.  The court nonetheless addressed both in detail.  Applying as the standard for affirmance "whether <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," id at 39, the court held that "substantial evidence" supported the implied malice elements of the prosecution's case — specifically, that petitioner intentionally deprived Jory of food and/or medical attention; that the consequences of these deprivations were dangerous to life; and that petitioner knew that these deprivations endangered Jory's life.

United States District Court

For the Northern District of California

Id at 41.  The court concluded that "[t]he jury could have reasonably inferred from all of the evidence that [petitioner] was in fact aware of Jory's need for food and for medical attention but nevertheless intentionally failed to provide food or take him to the doctor knowing that she was endangering his life."  Id.

Regarding the cause-of-death issue, the court of appeal noted that "[t]his argument stands out in [Sonya's] brief because it actually includes citations to the record.  She of course includes no citations to any case or statutory authority."  Id at 42, n 19.  The court held that the record contained a "more than adequate basis for the jury to have concluded beyond a reasonable doubt that Jory died of starvation."  Id at 43.

After her appeal was denied, petitioner unsuccessfully sought rehearing (Resp Ex C (Doc # 9)(Ex B thereto)), then sought review by the California Supreme Court.  In her petition for review, petitioner presented three issues:  (1) ineffective assistance of appellate counsel; (2) exclusion of BWS evidence at trial; and (3) denial of the motion for separate trials.  Resp Ex C.  Her brief included federal constitutional arguments regarding each of these issues.  Id.  On January 16, 2002, the California Supreme Court denied review by means of a one-sentence order.  Resp Ex D.

Petitioner next filed a petition for writ of habeas corpus in the California Supreme Court.  Resp Ex E.  In her petition and accompanying 132-page brief, petitioner presented, supported by federal constitutional arguments, five of the six issues that she has raised before this court on the instant petition.  Id.  She did not raise the issue of separate trials.  Id.  On November 25, 2003, the petition was denied without comment.  Resp Ex F.

United States District Court

For the Northern District of California

### III

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 USC § 2254, the scope of this court's habeas review is limited to considering challenges to a state conviction or sentence on the basis of a claim that was adjudicated on the merits in state court only if the state court's adjudication of the claim — "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 USC § 2254(d).

Prisoners in state custody who wish to challenge either the fact or length of their confinement collaterally in federal habeas proceedings are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of every claim they seek to raise in federal court. See 28 USC § 2254(b), (c); Rose v Lundy, 455 US 509, 515-16 (1982); Duckworth v Serrano, 454 US 1, 3 (1981); McNeeley v Arave, 842 F2d 230, 231 (9th Cir 1988). The state's highest court must be given an opportunity to rule on the claims even if review is discretionary. See O'Sullivan v Boerckel, 526 US 838, 845 (1999) (petitioner must invoke "one complete round of the State's established appellate review process.").

To comply with the "fair presentation" requirement, a claim must be raised at every level of appellate review; raising a claim for the first time on discretionary review to the state's

United States District Court

For the Northern District of California

highest court is insufficient.  <u>Casey v Moore</u>, 386 F3d 896, 918 (9th Cir 2004) (holding that where petitioner only raised federal constitutional claim on appeal to the Washington State Supreme Court, claim not fairly presented).  Exhaustion does not require repeated assertions if a federal claim is actually considered at least once on the merits by the state's highest court.  See <u>Castille v Peoples</u>, 489 US 346, 350 (1989); <u>Greene v Lambert</u>, 288 F3d 1081, 1086-87 (9th Cir 2002); <u>Turner v Compoy</u>, 827 F2d 526, 528 (9th Cir 1987).  For purposes of exhaustion, federal courts presume that an ambiguous or summary denial was a decision on the merits, because the higher court is presumed to have ruled on the same grounds as the lower court.  <u>Ylst v Nunnemaker</u>, 501 US 797, 803 (1991).

State courts must be alerted that prisoners are asserting claims under the United States Constitution in order to be given the opportunity to correct alleged violations of federal rights.  <u>Duncan v Henry</u>, 513 US 364, 365-66 (1995).  To raise a federal claim in a state-court proceeding, it is not sufficient to raise only the facts supporting the claim; rather, "the constitutional claim * * * inherent in those facts" must be brought to the attention of the state court.  <u>Picard v Connor</u>, 404 US at 277.  <u>See also</u> <u>Dye v Hofbauer</u>, 126 S Ct 5, 7 (2005) (federal due process claim based on prosecutorial misconduct was fairly presented where the text of the brief cited the Fifth and Fourteenth Amendments and federal prosecutorial misconduct cases).

Applying the rules regarding exhaustion to the claims presented in the instant petition, it appears that all claims have been exhausted; the court may therefore proceed to adjudicate all claims in the petition.

**United States District Court**

For the Northern District of California

A

Petitioner's challenge to her conviction largely turns on the viability of one, over-arching issue:  petitioner's contention that the trial court should have allowed the jury to hear testimony that Brian battered her and testimony about the effect of the alleged battering on her mental state as it related to her care of Jory.  Petitioner contends that the trial court's refusal to admit BWS evidence in connection with her defense violated her constitutional rights.

Respondent contends, as a preliminary matter, that the state appellate court's affirmance of the trial court's decision to exclude BWS evidence rests on an adequate and independent state ground and that therefore this federal court lacks jurisdiction to consider petitioner's BWS-evidence claim.  <u>See</u>, <u>e g</u>, <u>Vang v Nevada</u>, 329 F3d 1069, 1072 (9th Cir 2003).  This is the only claim that respondent argues is procedurally barred.  Specifically, respondent argues that the court of appeal's holding that petitioner's trial counsel had failed to meet his burden under California Evidence Code section 354 to lay an adequate foundation for the introduction of the evidence is an adequate and independent state ground barring federal habeas review, even though the court of appeal also adjudicated the merits of petitioner's BWS evidence claim.  Resp Mem at 20.  Respondent correctly points out, moreover, that petitioner's brief on appeal set forth no federal constitutional argument in support of the BWS-evidence issue; rather, arguments based on federal law first appeared in the petition for review to the California Supreme Court and were repeated in the habeas petition presented to that court.

A federal court will not review questions of federal law decided by a state court if: (1) the state court's decision was also based on a state law ground and (2) the state law ground was both independent and adequate to support the judgment. <u>Coleman v Thompson</u>, 501 US 722, 729 (1991). "The independent and adequate state ground doctrine prohibits the federal courts from addressing the habeas corpus claims of state prisoners when a state law default prevented the state court from reaching the merits of the claims." <u>Thomas v Lewis</u>, 945 F2d 1119, 1122 (9th Cir 1991).

California Evidence Code section 354, which respondent contends operates as a procedural bar to review of the BWS evidence claim, provides:

> A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that:
>
> (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means;
>
> (b) The rulings of the court made compliance with subdivision (a) futile; or
>
> (c) The evidence was sought by questions asked during cross-examination or recross-examination.

Cal Evid Code § 354. Respondent contends that petitioner's trial counsel "failed to comply with his burden * * * to make an adequate showing of the purpose of the evidence." Resp Memo at 20.

To be "adequate," the state procedural bar cited must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." <u>Calderon v United States</u>

United States District Court

For the Northern District of California

District Court (Bean), 96 F3d 1126, 1129 (9th Cir 1996).  The state bears the burden of proving the adequacy of a state procedural bar. Bennett v Mueller, 322 F3d 573, 585-86 (9th Cir 2003).

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner.  The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule.  Once having done so, however, the ultimate burden is the state's.

Id.

"Procedural default requires the by-pass of a procedural requirement, and not merely the by-pass of a procedural opportunity."  English v United States, 42 F3d 473, 477 (9th Cir 1994) (it was not procedural default for § 2255 petitioner to fail to raise claims for first time in petition for certiorari or motion to recall mandate, either of which would have been improper).  It is only the actual violation of a state procedural rule, and not, for example, mere failure to raise a claim in circumstances where no rule requires raising it, that triggers the procedural default doctrine.  Id.

Evidence Code section 354 employs two prongs:  the "miscarriage of justice" prong and the "substance * * * made known to the court" prong.  The state's procedural bar argument rests on a footnote in the court of appeal's opinion observing:  "it is worthy of note that Sonya's trial counsel never presented a coherent relevant basis for admission of the BWS evidence he sought so stridently to present," citing Evidence Code section 354.  Am Pet \\

31

1  Mem Ex F at 30, n 11.  The purported bar therefore rests on the

2  second prong of Evidence Code section 354's two-part test.

3        This is not a case in which trial counsel failed to set

4  forth his arguments on behalf of admitting the excluded evidence.

5  See, e g, People v Pride, 3 Cal 4th 195, 234-35 (1992)(citing

6  Evidence Code § 354, California Supreme Court upheld exclusion of

7  tape-recorded conversations where counsel had offered them for

8  defendant's "state of mind" at trial, then urged a different ground

9  on appeal —— that the tapes should have been admitted to rebut

10 inference that defendant lied to police).  Rather, as is detailed in

11 the Court of Appeal's opinion (Am Pet Mem Ex F at 25-30),

12 petitioner's trial counsel repeatedly advocated for the

13 admissibility of the BWS evidence on much the same grounds as those

14 presented to this court.  The trial court ruled that the proffered

15 BWS evidence was not relevant to any issue in the case —— not once,

16 but repeatedly.  Id at 26-30.

17       Here, therefore, the purported bar effectively merges with

18 the merits of the BWS-evidence issue.  The evidence was excluded,

19 not because trial counsel failed to present an argument for its

20 admission, but because the evidence was in fact irrelevant, as both

21 the trial court and the court of appeal held.  Because petitioner's

22 trial counsel repeatedly presented as arguments for admitting the

23 BWS evidence the same arguments made in petitioner's collateral

24 proceedings, this court is not convinced that the purported

25 procedural bar is "adequate" —— that is, "clear, consistently

26 applied, and well-established at the time of the petitioner's

27 purported default."  Calderon, 96 F3d at 1129.  The court,

28 therefore, proceeds to the merits of the BWS evidence claim.

United States District Court

For the Northern District of California

1      Petitioner has not challenged the instructions given to
2  the jury.  According to those instructions, the prosecution was
3  required to prove beyond a reasonable doubt on an implied malice
4  theory for second-degree murder that: (1) Jory's death was the
5  result of a deliberate act committed by petitioner, (2) petitioner
6  was aware of the high probability that her actions would result in
7  Jory's death and (3) petitioner performed the act with knowledge of
8  the danger to, and with conscious disregard for, Jory's life.
9  Recorder' Transcript (RT), Resp Ex B (Doc # 9) 4956:19-24, 25-26 -
10 4957:3-17.  As expressed by the court of appeal, the elements of the
11 prosecution's case on this charge were:

12         (1) Sonya intentionally deprived Jory of food
           and/or medical attention, (2) the lack of food
13         and/or medical attention for a young child had
           consequences which were dangerous to life; and
14         (3) Sonya knew that the lack of food and/or
           medical attention endangered Jory's life.
15

16 Am Pet Ex F at 41.

17      For felony child abuse, the prosecution was required to
18 prove beyond a reasonable doubt that:  (1) petitioner, with specific
19 intent to inflict substantial injury on Jory, purposefully (or with
20 reckless disregard of the consequences) inflicted unjustifiable
21 physical pain or mental suffering or otherwise permitted Jory to be
22 placed in a situation where his person or health was endangered and
23 (2) petitioner acted under circumstances likely to produce great
24 bodily harm or death to Jory. RT 4960-63.

25      For misdemeanor child abuse, the prosecution was required
26 to prove beyond a reasonable doubt that petitioner purposefully (or
27 with reckless disregard of the consequences) permitted her younger
28 son Anthony to become injured or to endure unjustifiable physical

1  pain or mental suffering or that petitioner otherwise permitted
2  Anthony to be placed in a situation where his person or health was
3  endangered.   RT 4963-64.

4          In support of her BWS-evidence claim, petitioner submits a
5  declaration by Dr Renata Vasselle-Augenstein, a psychotherapist and
6  self-described expert in family violence who counseled petitioner in
7  prison.  Dr Vasselle-Augenstein's declaration recites the history of
8  petitioner's behavior and her relationship with Brian Daniels and
9  states in pertinent part:

> Sonya eventually suffered from severe generalized
> anxiety which paralyzed her in relation to what
> [sic] her ability to relate and care for the
> children and impaired her daily functioning.  She
> was unable to notice physical and/or emotional
> changes in her children and to realistically
> assess what their needs were.  Her ability to
> think like an adult and make rational decisions
> was systematically eroded by Brian's overt and
> controlling and abusive behavior and the lack of
> any support system in her life.

16  Am Pet Mem Ex A at 6-7)

17  * * *

> The culmination of her traumatic childhood
> experiences, the several and growing abuse at the
> hands of her husband as well as the overwhelming
> isolation left her believing she had no options
> other than to tolerate the intolerable.  This
> resulted in unintentional fail [sic] to protect
> her children.  In her mind, unable to assess what
> her children needed, nor being able to see her
> children's dis-ease [sic], she believed she
> protected them so no harm could come to them
> through Brian.  Without any truly caring adult's
> intervention, she was left to her own devices in
> her own internal and external prison.

25  Id at 8.

> I am aware that when she cross-examined Sonya,
> the District Attorney asked her many questions
> which appear to support an inference that Sonya
> was fully capable during this period of time.  I
> believe that the jury could not adequately assess

34

United States District Court

For the Northern District of California

1    her behavior without knowing of her psychological
     state of Battered Women's Syndrome and [Post-
2    Traumatic Stress Disorder].

3  Id .

4        Dr Vasselle-Augenstein's declaration goes on to state that
5  she could have offered testimony to explain certain of petitioner's
6  actions and behaviors that were remarked on by the prosecution at
7  trial:  (1) her reluctance to let police into the house when she
8  reported Brian's abuse of her on March 31; (2) her inconsistent
9  statements to the police; (3) her flat affect when police came to
10 the apartment after Jory's death; (4) her assertive behavior toward
11 Brian in public situations (no specifics are provided); (5) her
12 declining counseling even though it was a condition of
13 reunification; (6) her filing lawsuits against businesses; (7) her
14 failure to call police or seek medical care for Jory even when Brian
15 was away at work or incarcerated; (8) her "flirtatious" letters to
16 Brian when they were both in jail after Jory's death; and (9) her
17 failure to realize that Jory was seriously ill.  Id at 9-11.

18       Petitioner also submits her own declaration dated March
19 31, 2003, reciting details of Brian's alleged abuse of her and of
20 Jory that she would presumably have testified to at trial if
21 allowed.  Am Pet Mem Ex B.

22       The most-cited description of BWS in California case law
23 appears in People v Aris, 215 Cal App 3d 1178, 1194-95 (1989), in
24 which the court of appeal summarized the testimony of Dr Lenore
25 Walker, "a clinical and forensic psychologist who is a nationally
26 recognized authority on battered women and is largely responsible
27 for the development of BWS."  Id at 1194.  According to Aris, BWS
28 includes increased sensitivity to danger from the batterer;

United States District Court

For the Northern District of California

involvement in an abusive relationship that follows a three-stage cyclical pattern of "tension-building," "acute explosion" and "loving contrition" together with "learned helplessness" leading to "a kind of psychological paralysis."  Id.

The legislature first enacted California Evidence Code section 1107 in 1991 to authorize the use of BWS evidence and has frequently amended it in the years since.  At the time of the Daniels's 1998 trial, it provided in pertinent part:

> (a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional or mental effects upon the beliefs, perceptions or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.

> (b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness.  Expert opinion testimony on battered women's syndrome shall not be considered a new scientific technique whose reliability is unproven.

Cal Evid Code § 1107.

Of note, Evidence Code section 1107(d) provides:  "This section is intended as a rule of evidence only and no substantive change affecting the Penal Code is intended."  It must therefore be read together with earlier-enacted Penal Code sections 28 and 29.  The former provides:

> (a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act [and] is admissible solely on the issue

United States District Court

For the Northern District of California

> of whether or not the accused actually formed a
> required specific intent, premeditated,
> deliberated, or harbored malice aforethought,
> when a specific intent crime is charged.
>
> (b) As a matter of public policy there shall be
> no defense of diminished capacity, diminished
> responsibility, or irresistible impulse in a
> criminal action or juvenile adjudication hearing.
>
> * * *
>
> (d) Nothing in this section shall limit a court's
> discretion, pursuant to the Evidence Code, to
> exclude psychiatric or psychological evidence on
> whether the accused had a mental disease, mental
> defect, or mental disorder at the time of the
> alleged offense.

Cal Pen Code § 28.

Penal Code section 29 limits the use of psychiatric or
mental-illness expert testimony in the guilt phase of a criminal
trial:

> [A]ny expert testifying about a defendant's
> mental illness, mental disorder, or mental defect
> shall not testify as to whether the defendant had
> or did not have the required mental states, which
> include, but are not limited to, purpose, intent,
> knowledge, or malice aforethought, for the crimes
> charged.  The question as to whether the
> defendant had or did not have the required mental
> states shall be decided by the trier of fact.

Cal Pen Code § 29.

California courts have deemed BWS evidence admissible in
criminal trials for a number of different purposes, but never as
evidence of diminished capacity in connection with the abused
party's crime against a third party.  See, e g, People v Humphrey,
13 Cal 4th 1073, 56 Cal Rptr 2d 142 (1996) (BWS expert testimony
admissible in murder prosecution not only on question of whether
defendant actually believed that it was necessary to kill in
self-defense, but also on question of reasonableness of that

belief); <u>People v Gadlin</u>, 78 Cal App 4th 587, 92 Cal Rptr 2d 890 (2000)(BWS evidence admissible to explain recantation of evidence of defendant's violent acts by prosecution witness); <u>People v Williams</u>, 78 Cal App 4th 1118, 93 Cal Rptr 2d 356 (2000)(BWS evidence admissible to explain changed testimony by victim of assault after single, severe incident of physical abuse).

Petitioner, however, wishes to avail herself of BWS evidence in support of her defense to crimes against a third party. Accordingly, petitioner has argued in every criminal proceeding pertaining to Jory's death, including her petition before this court, that the trial court should have admitted evidence of Brian's abuse of her for the purpose of negating the mental state element of the crimes with which she was charged.  <u>See, e g</u>, Am Pet (Doc #3) at 9:26-10:7.  In other words, while Evidence Code section 1107 does not specifically limit its applicability to crimes committed within the abuser-abused relationship, precedent for admitting BWS evidence in criminal prosecutions for crimes against third parties is lacking.  The general use that petitioner proposes for the BWS evidence is therefore not established under California law.

Moreover, the trial court determined that petitioner's proposed BWS evidence was not relevant to any issue in the case; this determination was affirmed at all levels of review in the California courts.

A careful review of the lengthy trial transcript reveals that the trial judge consistently ruled:  (1) that evidence that Brian Daniels abused Jory was admissible; and (2) that petitioner would be allowed to introduce evidence that she failed to care for Jory properly (by, for example, feeding him, taking him to school,

United States District Court

For the Northern District of California

taking him to the doctor) because her husband threatened to harm her or Jory if she did so.  Examples from the trial transcript follow. Petitioner never, throughout the entire trial, offered evidence of the latter type.  There appears in fact to be <u>no</u> evidence in the record that Brian Daniels, despite his obvious shortcomings as a father, insisted or even expressed the wish that Jory was to be starved.  Rather, petitioner sought over and over to introduce evidence that her husband battered her, but without tying it in any way to her failures in caring for Jory.

Before jury selection in the case began, the trial court discussed the BWS evidence issue at length with petitioner's counsel, pointing out that the introduction of such evidence typically occurred "in a context far different from what we have here," that is, in cases in which the defendant is charged with homicide against the batterer.  RT 792.  He ruled, moreover, that the defense's proposed use of Dr Vasselle-Augenstein's testimony —— to establish that "this syndrome is a motivating factor, a causative factor in either the action or lack of action on the part of Mrs Daniels," RT 794 —— was "totally inadmissible" because it was offered for the "ultimate issue:  state of mind."  Id.

The following portion of one of the many colloquies between the defense and the court about the inadmissibility of evidence of Brian's battering of petitioner, which occurred during the prosecution's cross-examination of petitioner, sets forth in detail the trial judge's stance on the issue:

> I ruled that evidence of the battered spouse
> syndrome is not relevant * * * as it bears upon a
> state of mind which isn't relevant in this case
> where she is alleged to have committed a murder
> against a third person and a child endangerment

1    against a third person.  The alleged batterer is
     not involved as a victim.  It really is a state of
2    mind issue that you have, basically, in California.
     That's diminished capacity.  It's not relevant as
3    to why she did what she did with respect to the
     third-person victims.

4

5    But if, in fact, she did not do something that she
     was required to do in the protection and caregiving
6    and safety of her children, or child Anthony, and
     Jory, as to the murder count, if she did something
7    because she was threatened either to do something
     or not do something, I always have said, and I've
8    been consistent, that she can testify that she
     didn't do something if she was threatened.  But if
9    she didn't do something because she had a state of
     mind, or her state of mind was such that she didn't
10   feel capable of doing it, I've ruled that that's
     not admissible.

11   But if somebody threatened her and said, for
     instance, for purposes of this discussion, "if you
12   bring Jory to the doctor, I'm going to beat you
     up," she can say that.  And I've never, by anything
13   I've ever said from the time this issue arose, said
     anything to the contrary.

14

15   RT 3678:1-28.

16       Somewhat later on during the prosecution's cross-

17   examination of petitioner, the prosecutor displayed a photograph of

18   Jory's emaciated corpse and asked petitioner how it was that she had

19   not noticed his "ribs sticking out."  Petitioner responded "I can't

20   tell you.  I want to, but I can't."  RT 3884.  The court declared a

21   recess.  After the jury had been excused, the judge turned to

22   petitioner and engaged her in a lengthy colloquy with the purpose of

23   determining the nature of the testimony that she had stated she

24   could not give.  In this exchange, the judge reiterated his view

25   that the excluded evidence of battering was inadmissible under

26   California Penal Code section 28:

27       THE WITNESS:   I thought [the prosecutor] was
                        asking me how come I couldn't tell
28                      how bad he was.

40

United States District Court

For the Northern District of California

1    THE COURT:        Exactly.

2    THE WITNESS:      Yeah.  And that's why I couldn't
                       tell how bad.
3
     THE COURT:        Why?
4
     THE WITNESS:      Because of the way I was.  I was a
5                      mess.  I mean, do you want me to
                       name all of the –
6
     THE COURT:        So you claim, again, that because
7                      you were abused by Brian,
                       emotionally or physically, that you
8                      could not see that your child was
                       in danger?
9
     THE WITNESS:      I'm just saying that I didn't know
10                     it was that bad.  I didn't.  And I
                       should have.
11
     THE COURT:        See, that's exactly * * * the issue
12                     I addressed.  That's exactly the
                       area I held was totally
13                     inadmissible.  That's the exact
                       replication, so to speak, of the
14                     diminished capacity defense, which
                       California doesn't acknowledge by
15                     statute in case law [sic].  That's
                       exactly what we ruled on so many
16                     occasions was not admissible.  The
                       shifting of responsibility because
17                     somebody claims they haven't got
                       the capacity to commit a crime
18                     against a third person in this case
                       because their spouse abused them.
19                     That's exactly what I ruled on so
                       many occasions she couldn't say.
20

21   RT 3887:11-3888:8.

22        Petitioner's amended petition states: "the prosecution's

23   theory was that [Jory] died of starvation because he was

24   intentionally deprived of food and/or medical care."  Am Pet (Doc

25   #3) at 12:21.  The prosecution presented overwhelming evidence that

26   Jory died from the effects of starvation combined with his parents'

27   failure to obtain medical treatment for him.  Critical evidence in

28   the prosecution's case consisted of:  (1) photographs of a severely

41

United States District Court

For the Northern District of California

emaciated five-year, eight-month old Jory, who weighed nineteen pounds at the date of his death (e g RT 2311-15; 2319-22, 2467, 2692); (2) testimony by the coroner who performed the autopsy stating that Jory died of starvation (RT 1140-81; 1188-1237; 1246-1323); (3) expert medical testimony describing the process of severe malnutrition and failure to thrive/grow, consistent with the coroner's examination of Jory; and testimony of various witnesses establishing that petitioner was the adult with primary responsibility for caring for the children during most of the relevant period and especially the weeks before Jory's death.

Petitioner's defense, meanwhile, was primarily based on challenging the prosecution's theory that Jory had died of starvation, apparently based on the premises that: (1) during the relevant time period, petitioner did not notice anything wrong with Jory and that he ate normally; (2) Jory might have died from disease rather than starvation; and (3) petitioner failed to seek medical attention for Jory because she was never aware he needed it or her husband discouraged her from seeking it. The evidence on which petitioner relied consisted of: (1) expert witnesses who testified that the evidence used to establish death by starvation could be attributed to certain organic diseases and infections (e g, testimony of radiologist James S Vaudagna, RT 3103-36); and (2) petitioner's own testimony, in which she admitted that she was responsible for caring for the children during the children during the relevant time period (RT 3710). On cross-examination, petitioner testified that neither she nor Brian had ever done anything to prevent the children from having food, RT 3766, had fed them regularly (RT 3637, 3710) and had told a police officer on the

United States District Court

For the Northern District of California

day Jory died that she had been feeding the children three meals and two snacks and day (RT 3814).  She also that she had never noticed that anything was wrong with Jory until the last three days of his life, when she thought he had the flu.  RT 3898-3900, 3903, 3910.

Given the defense's approach, it is difficult even to follow its logic in seeking to introduce the BWS evidence.  Numerous colloquies on the record in the case make clear that the defense sought to introduce BWS evidence in order to explain petitioner's failure to care for Jory —— to feed him, to obtain basic preventive medical care and treatment for him, to enroll him in school and so on.  This is starkly inconsistent with the theory that petitioner did in fact care for him adequately and undermines the credibility of much of her testimony.  Had the court admitted the BWS testimony, the jury would have been placed in the awkward position of choosing between two drastically different and conflicting versions of reality offered by the defense.  This fundamental problem is ignored in petitioner's papers and, for that matter, in a recent scholarly article arguing that admission of BWS in the Daniels case would have given the jury a more accurate view of petitioner's mental state and thus resulted in more fair adjudication of the charges against her. See Garcia, Kathy Luttrell, <u>Battered Women and Battered Children: Admissibility of Evidence of Battering and Its Effects to Determine the Mens Rea of a Battered Woman Facing Criminal Charges for Failing to Protect a Child from Abuse</u>, 24 J Juv L 101, <u>passim</u> (2003-04). Petitioner's primary defense fatally undermined the secondary one she complains of being prevented from presenting.  This means that even if the BWS-evidence issue, viewed in isolation, had merit (which it does not), the defense's attempt to cast doubt on the idea

that Jory died of starvation, together with petitioner's attendant credibility problems, effectively nullified any impact the purported error could have had on the fairness of the trial.

Respondent also argues that petitioner's constitutional argument is further weakened by the fact that the expert witness testimony on BWS proffered by the defense did not comport with reliability or validity requirements a state can impose on expert testimony under the United States Supreme Court's opinion in <u>Daubert v Merrell Dow Pharmaceuticals, Inc</u>, 509 US 579, 593-94 (1993). Resp Mem at 24-26. This point has considerable merit. Respondent argues: "The fact that BWS evidence is admissible under state law, Cal Evid Code § 1107, does not mean that the Constitution requires it to be admitted in every case, or that the state must assume that any testimony Dr Augenstein might choose to give in the guise of BWS evidence, is admissible." Id at 25:5-7. For example, appropriate screening criteria for expert witness testimony include whether the scientific basis for the conclusion is testable and has been adequately tested, the error rates associated with the technique or science, whether research has been published in a peer reviewed publication and whether the testimony grows out of research that has been conducted outside the litigation context. <u>Daubert</u>, 509 US at 593-94.

Although the California legislature, through Evidence Code section 1007, has specifically authorized the use of expert testimony on BWS for some purposes, other principles applicable to the introduction of expert witness testimony continue to apply. For example, the Vasselle-Augenstein declaration states she first treated petitioner three and one-half years after Jory's death (Am

**44**

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Pet Ex Mem A at 1), long after the critical events.  Respondent

correctly cites the Ninth Circuit's opinion in <u>Vincent v Heckler</u>,

739 F2d 1393, 1395 (9th Cir 1994) for the proposition that "after-

the-fact phychiatric diagnoses are notoriously unreliable."

Furthermore, the Vasselle-Augenstein declaration makes no mention of

empirical research supporting her theories about petitioner's mental

state but rather relies heavily on the writings of Dr Lenore Walker.

Am Pet Mem Ex 1 at 2-3.  These writings have been sharply criticized

for their lack of scientific rigor.  <u>See, e g</u>, David L Faigman and

Amy L Wright, <u>The Battered Woman Syndrome In the Age of Science</u>, 39

Ariz L Rev 67, 68 (1997):

> [Lenore Walker's second book] contains little
> more than a patchwork of pseudo-scientific
> methods employed to confirm a hypothesis that its
> author and participating researchers never
> seriously doubted.  Indeed, the 1984 book would
> provide an excellent case study for now <u>not</u> to
> conduct empirical research.

Faigman and Wright further opined that some courts have been overly

hasty about admitting BWS expert testimony given the shaky

scientific basis for the "syndrome."  Id.  On the opposite side of

the coin, therefore, courts may nonetheless exclude specific expert

testimony concerning BWS in a particular case based on the lack of

scientific rigor establishing appropriate reliability or validity

requirements.  <u>Daubert</u>, 509 US at 593-94.

In presenting her federal habeas law arguments, petitioner

relies heavily on the Ninth Circuit's opinion in <u>Greene v Lambert</u>,

288 F3d 1081 (9th Cir 2002), which affirmed an order by a federal

district court in Washington State granting the writ.  In <u>Greene</u>,

the defense had sought to proceed on an insanity-defense theory, yet

the trial court had refused to allow him to proceed on this theory

United States District Court

For the Northern District of California

or to present a defense of diminished capacity which, of note, was specifically allowed under state law.  The Washington Supreme Court had, moreover, determined in the case record that "dissociative identity disorder" (DID) (formerly referred to as "multiple personality disorder"), with which the defendant claimed to be afflicted, was "a generally accepted diagnosis in the relevant scientific community, which can form the basis for a defense in a criminal case."  Id at 1092.  The trial court had further granted the state's motion to preclude any mention of DID on the ground that there was "no discernable standard to justify a diagnosis."  Id at 1084-85.  These rulings apparently resulted in "abridged" testimony by the psychiatric nurse who had been the defendant's therapist both during a previous period of incarceration and after his release; this nurse had both diagnosed and treated the defendant and had later become the victim of the sexual assault that resulted in the conviction that was the subject of the habeas proceedings.  Id at 1090.  Given the lack of a reasoned decision by the state court on the federal claim, the Ninth Circuit found no basis for "AEDPA deference" and therefore conducted an independent review of the entire record in the Greene case.

     In holding that the exclusion of both percipient and expert witness testimony about DID "disproportionately infringed upon weighty interests" of the accused under United States Supreme Court precedents in Washington v Texas, 388 US 14 (1967) and Rock v Arkansas, 483 US 44 (1987), the Ninth Circuit emphasized that its holding in the case was narrow, requiring only that the defendant and his victim be allowed to testify about his state of mind at the time of the attack.  288 F3d at 1093.  The court specifically stated

United States District Court

For the Northern District of California

that it did <u>not</u> hold, as relevant here:  that "a defendant or a victim must be allowed to present any defense, no matter how bizarre or far fetched"; that the result would be the same if only expert testimony were at issue; that expert testimony about DID must be admitted as a matter of federal constitutional law; or that a state could be precluded from requiring any appropriate foundation for expert testimony in that or any other case.  Id.

The instant matter bears little similarity to the <u>Greene</u> case.  Petitioner did not present an insanity defense, but rather presented a primary defense of contending that she fed her son regularly and he did not starve to death.  The federal grounds for petitioner's challenge to the exclusion of BWS evidence were properly exhausted and addressed by means of a reasoned opinion of the state court by means of the <u>Ylst</u> doctrine.  The expert whose testimony was excluded was not a percipient witness, but a therapist who first met petitioner years after the events at issue in the trial.  And, most importantly, Washington State law expressly provides for a defense of diminished capacity, whereas California has expressly abolished this defense.  <u>Greene</u> is therefore inapposite.

Much of petitioner's argument on the BWS issue avoids the central point that the trial court's exclusion of the evidence, as affirmed by the court of appeal, was correct under Penal Code section 28 and 29; indeed, petitioner has never argued convincingly otherwise.  To attack the exclusion of this evidence on federal constitutional grounds, therefore, petitioner must persuade the court that Penal Code section 28's abolition of the defense of diminished capacity and the concomitant rules excluding evidence of

United States District Court

For the Northern District of California

1  mental-state evidence in Penal Code sections 28 and 29 violate due

2  process.  Although petitioner has not made this argument directly,

3  the court will nonetheless address it for the sake of completeness,

4  given the importance of this issue in the context of the entire

5  petition.

6           Relevant to the constitutionality of prohibiting expert

7  testimony regarding mental state to refute the presence of mens rea

8  is the Ninth Circuit's recent opinion in Menendez v Terhune, 422 F3d

9  1012 (9th Cir 2005).  Although it does not directly address the

10 potential constitutional issues arising from Penal Code sections 28

11 and 29, Menendez addresses closely related issues and is

12 instructive.  Affirming the district court's denial of a habeas

13 petition, the Ninth Circuit examined, as relevant here, the trial

14 court's decision to exclude lay and expert witness testimony

15 proffered for the purpose of showing that the defendant and his co-

16 defendant brother "feared their parents."  Id at 1030.  As in

17 Greene, the court reviewed the claim de novo because the state court

18 had not reached the merits of the federal issue.  Id at 1026.  As in

19 the instant matter, however, the brothers had never seriously placed

20 their sanity or capacity in issue as part of their defense.  If they

21 had done so, the court noted, they would have been entitled to

22 certain constitutionally-mandated protections under Ake v Oklahoma,

23 470 US 68 (1985).  Id at 1026-27.

24          Instead, the Menendez defendants proceeded on an

25 "imperfect self-defense" theory which required them to establish

26 that "[t]hough a reasonable person need not view the peril as

27 imminent, the defendant must make some showing that he actually

28 believed the peril to be imminent."  Id at 1028.  When defendants

48

sought to introduce evidence that included, <u>inter alia</u>, expert witness testimony by a Dr John Conte that one of the brothers suffered from "Battered Person's Syndrome," the trial court excluded the evidence on grounds of relevance.  The trial court's reasoning, quoted at length in the Ninth Circuit's opinion, is set forth in abbreviated form here:

> The issue * * * is the state of mind of the defendants at the time of the killing as to whether there was an actual belief of imminent danger of death or great bodily injury and a need to act.
>
> * * *
>
> It's really irrelevant, and it would be totally irrelevant to any trial, that the defendants had been abused or that they fit a particular diagnosis of being abused. That's totally irrelevant, unless it corroborates their testimony as to their mental state at the time of the crime.  If it doesn't do that, then the fact that they happen to be abused or happen to fit a particular diagnosis is irrelevant.

Id at 1031.  Applying a non-deferential rule of decision, the Ninth Circuit found that the state court's decision was proper and affirmed the district court.  This reasoning appears entirely consistent with the trial court's rulings on the BWS evidence in the instant matter.

        In its recent term, the United States Supreme Court offered significant guidance to courts considering constitutional challenges to state statutes limiting the introduction of mental state evidence.  In <u>Clark v Arizona</u>, ___ US ___, 126 S Ct 2709 (2006), the court considered the constitutionality of a state law limiting the presentation of mental capacity evidence on the issue of <u>mens rea</u>.  Noting the traditional recognition of states' capacity

United States District Court

For the Northern District of California

to define crimes and defenses, the court observed that a state law governing criminal responsibility would be deemed "fundamental" for purposes of constitutional due process analysis only if it "offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," citing <u>Patterson v New York</u>, 432 US 197 (1977).  126 S Ct at 2719.

The court examined and upheld Arizona's rule, articulated in <u>State v Mott</u>, 187 Ariz 536 (en banc) (1997)(a case that, coincidentally, concerned the culpability of a battered woman for her child's death at the hands of her batterer), allowing the introduction of "observation evidence" —— i e, evidence relevant to what in fact was in the defendant's mind when he committed the offense —— but prohibiting the introduction of "mental-disease evidence" in the form of opinion testimony by mental health professionals serving as experts in the proceeding and "capacity evidence," typically expert testimony regarding the details of a specific mental condition.  126 S Ct at 2724-25.

The court further held that while a state statute authorizing an insanity defense may place the burden of persuasion on the defendants without running afoul of the Constitution, the state "must be able to deny a defendant the opportunity to displace the presumption of sanity more easily when addressing a different issue in the course of the criminal trial."  Allowing the introduction of expert testimony "for whatever a factfinder might think it was worth on the issue of <u>mens rea</u>" would be such an opportunity.  126 S Ct at 2732.  The constitutionality of California's "presumption of sanity" and attendant burden-shifting on the issue of competency was specifically adjudicated in the

state's favor in <u>Medina v California</u>, 505 US 437 (1992), <u>reh'g denied</u>, 505 US 1244.

The court in <u>Clark v Arizona</u> held that a state "that wishes to avoid a second avenue for exploring capacity, less stringent for a defendant, has a good reason for confining the consideration of evidence of mental disease and incapacity to the insanity defense." Id at 2733. Of particular relevance here, the court observed that the term "diminished capacity" has traditionally been associated with California law, citing California Penal Code sections 28 and 29. Id at 2733 n 41.

In upholding states' right to limit evidence of mental capacity to a defendant's attempt to prove an insanity defense, the court also considered the many uncertainties inherent in the use of mental-disease evidence, including "the controversial character of some categories of mental disease," "the potential of mental disease evidence to mislead," and "the danger of according greater certainty to capacity evidence that experts claim for it." Id at 2734.

In summary, <u>Clark v Arizona</u> leaves no doubt as to the constitutionality of California Penal Code sections 28 and 29 in cases like petitioner's. Given that the trial court's rulings on the BWS evidence in this case were consistent with Penal Code sections 28 and 29 and that those sections are constitutional under the principles enunciated in <u>Clark v Arizona</u>, there is no basis for federal habeas relief in relation to trial court's exclusion of BWS evidence.

\\

\\

\\

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

**B**

Petitioner next asserts that the prosecutor committed misconduct while cross-examining her by pressing for an explanation of her conduct knowing that she was barred from testifying about Brian right's physical abuse of her.

Prosecutorial misconduct warrants federal habeas relief when it amounts to a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the resulting conviction a denial of due process." <u>Darden v Wainwright</u>, 477 US 168, 181 (1986).  A defendant's due process rights are violated only when a prosecutor's misconduct renders a trial "fundamentally unfair."  Id at 183.  Under <u>Darden</u>, the first issue is whether the prosecutor's conduct was improper; if so, the court considers whether such conduct infected the trial with unfairness.  <u>Tan v Runnels</u>, 413 F3d 1101, 1112 (9th Cir 2005).  In <u>Comer v Schriro</u>, 463 F3d 934, 961 (9th Cir 2006), for example, the Ninth Circuit held that while it was improper for the prosecutor to call petitioner a "monster," "filth" and a "reincarnation of the devil," there was no due process violation because the prosecutor did not misstate or manipulate the evidence, the jury instructions provided by the court were adequate and there was strong evidence of petitioner's guilt. The standard of review for prosecutorial misconduct is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict, rather than whether it was harmless beyond a reasonable doubt."  <u>Brecht v Abrahamson</u>, 507 US 619, 637-38 (1993).

According to her brief, petitioner was on the stand for three-and-one-half days.  Am Pet Mem (Doc # 4) at 45.  The entire

transcript of petitioner's testimony begins on page 3540 and runs to page 4218.   The prosecutor's cross-examination runs from page 3622 to page 3953.   The court has carefully reviewed the entire transcript of the cross-examination.

It is neither possible nor necessary to address each instance of alleged misconduct raised in petitioner's brief individually.   It is noteworthy, however, that Brian Daniels' attorney moved for a mistrial because of the way petitioner was answering the prosecutor's questions on cross-examination.   e g RT 3894-95.   The trial court instructed petitioner repeatedly not to respond "I can't answer that" or "there were things going on in the home."   e g RT 3884-85.   The manner in which the court handled disagreements about petitioner's answers during cross-examination by the prosecutor was addressed in part III.A, <u>supra</u>.   In addition, the trial court directed the prosecutor to stop asking petitioner "why" questions, explaining his reasoning as follows:

> I understand the issue.   And it's somewhat of a dilemma, because I can understand if she is asked a question why didn't you do something, and if in her mind she didn't do it because of this situation that she found herself in with the co-defendant, and that somehow affected her judgment, so to speak, that she might tend to want to respond in that fashion if the question is asked, well, why didn't you do that.
>
> I'm just simply saying that that state of mind that she wants to express is not admissible and relevant in California as I understand it, because it simply goes to diminished capacity; but it might be responsive to the question.   And that's the problem.

RT 3679-80.   The trial court denied the motion for mistrial and continued to enforce its ruling despite repeated instances of non-compliance.   <u>See</u>, <u>e g</u>, RT 3885-88, 3893-94 (colloquy between

United States District Court

For the Northern District of California

petitioner and court also discussed <u>supra</u> in Part III.A).  The prosecutor complied with the order.  The trial court's handling of the issue was consistent with California law and the state appellate courts' decisions upholding the trial court did not unreasonably apply federal law in upholding those rulings.

Petitioner's contentions regarding prosecutorial misconduct suffer from the same infirmities as her arguments in favor of admitting BWS evidence generally.  Petitioner's incoherent defense theory is more to blame for the problems petitioner experienced under cross-examination than the prosecutor's questions. The transcript makes clear that the prosecutor was making every effort to carry out her responsibility to prove her case without running afoul of the court's orders; there is no misconduct under the standards applicable on habeas review.

C

Petitioner next asserts judicial misconduct.  She contends that the trial court prejudiced her by "repeatedly denigrat[ing] [her] counsel's competence and integrity in front of the jury," thus depriving her of a fair trial.  In her lengthy briefing of this issue (Am Pet Mem at 63-79), petitioner cites little federal law and does not discuss AEDPA.  Rather, most of her legal analysis rests on state law principles, with which a federal court cannot concern itself on habeas review.

The pre-AEDPA case of <u>Duckett v Godinez</u>, 67 F3d 734 (9th Cir 1995), remains the Ninth Circuit's leading case on this type of alleged judicial misconduct and is cited by both petitioner and respondent.  In <u>Duckett</u>, the court held that federal habeas review

54

United States District Court

For the Northern District of California

1  of a claim of judicial misconduct by a state judge does not simply

2  require that the federal court determine whether the state judge

3  committed judicial misconduct; rather, the question is whether the

4  state judge's behavior "rendered the trial so fundamentally unfair

5  as to violate federal due process under the United States

6  Constitution."  Id at 740.  The court considered the judge's

7  actions, which included demonstrating "clear frustration and

8  hostility" toward a witness, "in the context of the trial as a whole

9  * * * not * * * 'of sufficient gravity to warrant the conclusion

10  that fundamental fairness has been denied.'"  Id.

11        As respondent correctly points out, the first instance of

12  alleged judicial misconduct of which petitioner complains did not

13  occur until after the trial had been under way for six weeks, well

14  into the defense's presentation of its case.  The court has reviewed

15  all of the portions of the transcript petitioner has cited in

16  support of this claim.

17        It is apparent from the first cited colloquy, at pages

18  3548-54, that while the trial judge was annoyed with petitioner's

19  trial counsel, much of that annoyance was due to counsel's

20  persistence in attempting to introduce evidence that the court had

21  already ruled inadmissible ─── in this case, evidence that Brian

22  Daniels abused petitioner.  In that instance, counsel had asked

23  petitioner in the presence of the jury whether Brian Daniels had

24  asked her to have an abortion when she was pregnant with Anthony, to

25  which petitioner readily answered "yes."  Id at 3548.  In response

26  to a relevance objection from Daniels's attorney, counsel stated

27  "It's not irrelevant.  It's relevant on destruction of a baby.

28  That's exactly what this case is about."  Id at 3549.  During the

United States District Court

For the Northern District of California

ensuing side-bar, the judge forcefully admonished counsel that he

considered the comment "highly prejudicial" and that the planned

series of questions was relevant only to spousal abuse (not child

abuse as counsel had urged) and was therefore inadmissible based on

the court's earlier rulings:

> Mr Leininger, it's not relevant.  It's not
> admissible.  It's evidence of alleged spousal
> abuse.  We have ruled on that.  We have had
> hearings on that.  We have had points and
> authorities submitted.  We have had legal
> arguments.  We have had writs filed in the
> appellate court on that issue.  And this is
> nothing other than evidence that Mr Daniels
> committed spousal abuse.

Id at 3553:7-14.

An examination of the ten-odd instances petitioner points

to in her brief reveals, at worst, one occasion on which the judge

characterized counsel's words as "petty comments," (RT 3882:26-

3883:2) and another on which he accused counsel of "childish

tactics," RT 3898:9-13.  At another point, the judge took

appropriate and effective steps to correct a potential misstep or

misunderstanding arising from his comments following a defense

objection during the prosecutor's rebuttal:  having commented within

the jury's hearing that "I think from a professional point of view,

that ethically a prosecutor would not prosecute a case unless he or

she felt that, in fact, the defendants committed the offense," (RT

4869:16-20) the judge returned to the subject while instructing the

jury, giving a clarification that ran to thirty-three lines of

transcript; the following is a representative excerpt:

> I made the comment that a prosecutor would
> not charge a case unless he or she thought
> they could prove it.  It's common sense,
> unless you have a corrupt prosecutor.  That
> does not mean that your job is to rubber-

**United States District Court**

For the Northern District of California

1                stamp his or her value judgment because they
                 charged an offense.  Because under the law,
2                * * * the defendant is presumed to be not
                 guilty.

3

4  RT 4983:14-21.  The last third of the 5042-page trial transcript

5  contains hundreds of consecutive pages in which petitioner has

6  identified no instances of judicial hostility or even irritation

7  towards petitioner, her counsel or towards any defense witness.

8         Applying the <u>Duckett</u> standard to the instant case,

9  petitioner has not established more than scattered instances of

10  irritation or impatience on the part of the trial judge, far short

11  of the kind and amount of judicial behavior that would "render[] the

12  trial so fundamentally unfair as to violate federal due process

13  under the United States Constitution."  <u>Duckett</u>, 67 F3d at 740.

14  Applying AEDPA's even more stringent standard, this court would have

15  to find that the California Supreme Court's denial of petitioner's

16  habeas petition, in which this issue was first raised and framed as

17  a federal constitutional violation, was "contrary to, or involved an

18  unreasonable application of, clearly established Federal law, as

19  determined by the Supreme Court of the United States."  28 USC §

20  2254(d).  This record does not support such a finding.

21

22                        D

23         Petitioner next contends that the trial court's ruling

24  allowing the prosecution to admit on cross-examination petitioner's

25  letters to Brian Daniels from prison while awaiting trial, when

26  combined with the exclusion of the BWS evidence, "tipped the balance

27  even further against Sonya and prevented a fair and just

28  determination of her real degree of culpability."  Am Pet Mem (Doc

United States District Court

For the Northern District of California

#4) at 85.  Specifically, the prosecutor read into the record
excerpts from a "stack of letters" petitioner had written to her
husband.  Many of the letters are flirtatious in tone and most talk
about petitioner's interest in obtaining various foods.  RT 3690-
3702.  With her traverse, petitioner offers as a separate, related
ground that this issue was not put before the court of appeal on
direct appeal due to her counsel's alleged ineffectiveness.
Traverse Mem (Doc # 16) at 30-31.

After the prosecutor sought permission to cross-examine
petitioner about the letters, petitioner's trial counsel argued that
they should be excluded as irrelevant "jail talk" because people who
are in prison often talk about food.  RT 3683-84.  The trial court
overruled the objection with the following comment:

> Ordinarily, I would find it wouldn't be
> [relevant], because what happens in jail is
> ordinarily not something for the trier of fact.
> It's not relevant on any issue whether somebody is
> in custody or is not in custody, et cetera.  But
> in view of the context of the charges in this
> case, torture by starvation, in view of the fact
> of the medical situation, size and weight of Jory
> at his death, I think food is an issue.  And so
> I'll allow it to come in because I think it is
> relevant.

Id.  The prosecutor then read or paraphrased more than thirty
passages of varying lengths from petitioner's letters, of which the
following is illustrative:

> I just finished ordering my commissary.  I bought
> eatables [sic] cheese and crackers, cup of
> noodles, trail mix, sugar and lemonade.  They
> have no chocolate.  I lust for chocolate.  I
> desire and want it in the worst way.  It's such
> torture too. [Etc.]

RT 3699:5-10.  Petitioner argues that "in the context of a case of
starvation, such comments and apparent obsession with food would not

1   be perceived by the jury as anything but extremely callous, perverse

2   and inflammatory." Traverse Mem at 31.

3         The admission of evidence is not subject to federal habeas

4   review unless a specific constitutional guarantee is violated or the

5   error is of such magnitude that the result is a denial of the

6   fundamentally fair trial guaranteed by due process.  See Henry v

7   Kernan, 197 F3d 1021, 1031 (9th Cir 1999).  Where, as here, the

8   evidence of petitioner's guilt is overwhelming, it is even less

9   likely that admission of a particular piece of evidence will render

10  the trial fundamentally unfair.  Dillard v Roe, 244 F3d 758, 766-67

11  (9th Cir 2001) (admission of prosecution's expert testimony did not

12  render trial fundamentally unfair where evidence against petitioner

13  was overwhelming).

14        Of note, both defendants in the instant matter were

15  acquitted of the torture charge, to which the trial court found the

16  prison letters relevant.  Petitioner's contention before this court,

17  therefore, must be that the prison letters not only made the jury

18  more inclined to convict petitioner of second degree murder, but

19  rendered the trial fundamentally unfair into the bargain.

20  Petitioner has not met this burden.  The letters do not appear

21  squarely relevant to the charges, given that they were written after

22  petitioner was in prison for Jory's death, but the trial court's

23  decision to admit them, even if erroneous, could not warrant federal

24  habeas relief given the overwhelming evidence supporting the

25  conviction and the relatively inconsequential nature of the prison

26  letters in the context of the totality of the evidence presented.

27  \\

28  \\

United States District Court

For the Northern District of California

**E**

As noted in Part II <u>supra</u>, the court of appeal made many references to the deficient briefing and incompetent representation provided by petitioner's appellate counsel, Brenda Malloy. Petitioner now contends that the court of appeal's refusal to strike the brief prepared by Ms Malloy and to allow present counsel to file a different one violated her constitutional right to effective assistance of counsel on appeal.

Respondent does not contend that Ms Malloy was effective, but rather that when petitioner raised the ineffective assistance of counsel ("IAC") claim before the California Supreme Court and in her state habeas corpus proceedings, she failed either to link Ms Malloy's ineffective assistance to a failure to raise any potentially significant issue not raised or otherwise to explain how Ms Malloy's representation prejudiced her on appeal.  Resp Mem (Doc # 8) at 56-57.  Respondent asserts, moreover, that petitioner's IAC claim before this court suffers from similar defects and that "[s]he cannot raise a claim of prejudice for the first time in her traverse."  Id at 57.

Petitioner asserts in her traverse that she did, in fact, argue prejudice in connection with her IAC claim in the state courts, to wit:  "the wrong entity constructed issues without acting solely as her advocate, rejected its own issues, and * * * determin[ed] * * * what a lawyer it believed a incompetent was trying to say."  Traverse Mem at 32.  Moreover, petitioner asserts, the court of appeal "refused to follow the proper procedures established in California when ineffective assistance of appellate counsel is established."  Id.  Specifically, petitioner asserts that

United States District Court

For the Northern District of California

1   the action of the court of appeal ran afoul of precedents

2   established in <u>Smith v Robbins</u>, 528 US 259, <u>Penson v Ohio</u>, 488 US

3   75 (1988) and <u>Evitts v Lucey</u>, 469 US 387 (1985).

4           The Due Process Clause of the Fourteenth Amendment

5   guarantees a criminal defendant the effective assistance of counsel

6   on his first appeal as of right.  <u>See</u> <u>Evitts v Lucey</u>, 469 US 387,

7   391-405 (1985).  Although the right to the effective assistance of

8   counsel at trial is guaranteed to state criminal defendants by the

9   Sixth Amendment as applied to the states through the Fourteenth

10  Amendment, it does not address a defendant's rights on appeal; the

11  right to effective state appellate counsel is derived purely from

12  the Fourteenth Amendment's due process guarantee.  Id at 392. Claims

13  of ineffective assistance of appellate counsel are reviewed

14  according to the standard set out in <u>Strickland v Washington</u>, 466 US

15  668 (1984).  <u>Miller v Keeney</u>, 882 F2d 1428, 1433 (9th Cir 1989);

16  <u>United States v Birtle</u>, 792 F2d 846, 847 (9th Cir 1986).  Under

17  these authorities, petitioner's burden is to show that (1)

18  "counsel's advice fell below an objective standard of

19  reasonableness" and (2) that there is a "reasonable probability

20  that, but for counsel's unprofessional errors, [she] would have

21  prevailed on appeal."  <u>Miller</u>, 882 F2d at 1434 & n 9 (citing

22  <u>Strickland</u>, 466 US at 688, 694; <u>Birtle</u>, 792 F2d at 849).

23          In this case, Ms Malloy's ineffectiveness as an attorney

24  in other clients' matters has already been adjudicated by the State

25  Bar Court.  According the State Bar's website, on December 12, 2002,

26  Ms Malloy was suspended for two years for failure "to perform legal

27  services competently, release a client file, respond to client

28  inquiries, update her membership address or cooperate with the bar's

**United States District Court**
For the Northern District of California

1  investigation, and she improperly withdrew from employment."

2  http://members.calbar.ca.gov/search/member_detail.aspx?x=88626.

3  (Web page consulted December 11, 2006).  The detail of the charges

4  against Ms Malloy includes failing to file an appeal after agreeing

5  to do so and failing to turn over a client's file in order for him

6  to pursue an appeal.  Id.  Ms Malloy resigned in September 2003 with

7  charges pending.  Id.

8       Ms Malloy's ineffectiveness in representing petitioner on

9  appeal is strongly suggested by the court of appeal's scathing

10  critique of her briefing and by her unexplained failure to appear at

11  oral argument.  Respondent does not contend that Ms Malloy's

12  representation of petitioner met an objective standard of

13  reasonableness.  Petitioner has therefore satisfied the first prong

14  of the <u>Strickland/Miller</u> analysis.

15       Petitioner's IAC claim, however, founders on the second

16  prong of the test, which requires her to establish that, but for Ms

17  Malloy's unprofessional errors, she would have prevailed on appeal.

18  In <u>Miller</u>, the court focused on counsel's decision not to raise

19  certain issues on appeal and determined that the failure to do so

20  did not establish an IAC claim if the omitted issue gave the

21  defendant "only a remote chance of obtaining reversal * * *."  882

22  F2d 1428, 1435.  In petitioner's case, respondent correctly points

23  out that petitioner has failed to identify any potentially

24  worthwhile issue that Ms Malloy did not include in her brief.

25  Rather, her IAC claim rests on the <u>quality</u> of the briefing Ms Malloy

26  submitted and the fact that the court of appeal, rather than

27  petitioner's chosen advocate, discerned and articulated some of

28  petitioner's issues on appeal from  poorly-written briefs.

In the view of this court it is unfortunate, given the serious and unusual nature of the charges and the obvious problems with petitioner's appellate representation (most dramatically illustrated by her failure to appear at oral argument), that the court of appeal did not grant petitioner's motion to submit briefs prepared by her new counsel. Nonetheless, it is not this court's function in connection with a habeas petition to second-guess or re-do decisions made by state courts. Rather, its role under AEDPA is to determine whether state courts are applying federal law unreasonably; the record in this matter does not support a finding that the court of appeal applied federal law unreasonably.

F

Petitioner lastly contends that the trial court's refusal to grant her a trial separate from Brian Daniels amounted to a constitutional deprivation of due process.

California law favors joint trials of co-defendants jointly charged with the same offense. Penal Code section 1098 provides: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." The California Supreme Court has held that Penal Code section 1098 means "a trial court <u>must</u> order a joint trial as the 'rule' and <u>may</u> order separate trials only as the 'exception.'" <u>People v Alvarez</u>, 14 Cal 4th 155, 190 (1996). As the court of appeal observed, the "classic situation for joint trial" is a case in which the co-defendants are charged with "common crimes against common victims." Am Pet Mem Ex F at 35, citing <u>People v Turner</u>, 37 Cal 3d 302, 312 (1984). As in the

63

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  federal system, the decision to grant or deny a motion for severance

2  in California is "committed to the sound discretion of the trial

3  court."  <u>People v Cummings</u>, 4 Cal 4th 1233, 1286 (1993).

4        On habeas review of a state conviction under 28 USC §

5  2254, however, a federal court does not become involved in issues of

6  state law governing severance.  <u>Grisby v Blodgett</u>, 130 F3d 365, 370

7  (9th Cir 1997).  Its inquiry is limited to the petitioner's right to

8  a fair trial under the United States Constitution.  A petitioner's

9  burden is to demonstrate that the state court's joinder or denial of

10 his severance motion resulted in prejudice great enough to render

11 his trial "fundamentally unfair."  Id.  This means that "the

12 impermissible joinder must have had a substantial and injurious

13 effect or influence in determining the jury's verdict."  <u>Sandoval v

14 Calderon</u>, 241 F3d 765, 772 (9th Cir 2000).

15       In this case, it was Brian Daniels, not petitioner, who

16 first moved for a separate trial.  Petitioner first opposed the

17 motion, then later joined it.  Brian Daniels first moved on grounds

18 that potential admission of extrajudicial statements by petitioner

19 would violate his due process rights under "<u>Aranda/Bruton</u>," <u>People v

20 Aranda</u>, 63 Cal 2d 518 (1965) and <u>Bruton v United States</u>, 391 US 123

21 (1968) based on a prediction that petitioner's defense would be

22 based in part on an attempt to shift responsibility for care of the

23 children during the weeks before Jory's death to her husband (Resp

24 Ex A (CT 0718-25).  Later, he augmented the motion with the argument

25 that the admission of evidence that Brian Daniels battered

26 petitioner and the expert testimony regarding BWS would prejudice

27 the jury unfairly in its determination of the charges against him.

28 Am Pet Mem Ex F at 34.  Because the <u>Aranda/Bruton</u> problems proved to

United States District Court

For the Northern District of California

1  be non-existent and the trial court disallowed the BWS evidence in a

2  motion in limine, the trial court denied the motion for severance.

3          In her federal habeas petition, petitioner's argument that

4  the trial court's denial of her severance motion violated her due

5  process rights amounts to a re-hash of her BWS-evidence issues.  She

6  asserts that she "was denied a fair trial by the joinder because the

7  court elected to protect Brian's right to a fair trial over her

8  right to present a defense."  Am Pet Mem at 105.  She asserts that

9  the trial court's exclusion of the BWS evidence was "because it

10 would prejudice [Brian Daniels]," citing to a page in the transcript

11 (RT 2607) that has nothing to do with such evidence.  Id.

12         The record, however, abundantly demonstrates that it was

13 the lack of relevance, not concern over potential prejudice to Brian

14 Daniels, that led the trial court to exclude the BWS evidence.

15 Given this court's determination that the exclusion of BWS evidence

16 did not violate petitioner's constitutional right to a fair trial,

17 her challenge to the trial court's denial of severance is similarly

18 unavailing.

19         The trial court's denial of petitioner's severance motion,

20 and the state appellate courts' affirmance of that denial, were not

21 "contrary to" or "an unreasonable application of" clearly

22 established federal law and therefore cannot form the basis for a

23 writ of habeas corpus.

24 \\

25 \\

26 \\

27 \\

28 \\

65

IV

          For all the reasons stated herein, the petition for writ
of habeas corpus is DENIED.


          IT IS SO ORDERED.


                                        _____
                                        VAUGHN R WALKER
                                        United States District Chief Judge